## BO OLIVER v. STATE.

No. A-8891.   Oct. 3, 1935.
(49 Pac. [2d] 1109.)

Meacham, Meacham & Meacham, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and Lowell R. Smith, Co. Atty., for the State.

DAVENPORT, P. J.   The plaintiff in error, for convenience referred to in this opinion as the defendant, was tried upon a charge of murder, convicted of manslaughter, and sentenced to imprisonment in the state penitentiary for a term of thirty-five years.

The testimony briefly is as follows:

T. B. Semore stated:

"My name is Tom Semore; I live at Wagoner, Oklahoma; Leonard Semore was my son; Leonard Semore died December 31, 1933, at my home in Wagoner; he was twenty-two years old, and weighed about 158 to 160 pounds; was six foot tall.   About the 15th of November, 1933, Leonard left Wagoner and went out near Sentinel, Oklahoma; the next time I saw him he was at Hobart, in a hospital, on

the 29th of November, 1933, where he remained for about fifteen days; he was treated by Dr. Adams; at the expiration of fifteen days he was removed from Dr. Adams' hospital to Wagoner, my home; Dr. Plunkett treated him at my home."

Frank Roberts, in substance, testified as follows:

"I live at Sentinel, Okla., where I was living November 29, 1933; I knew Butch Allen and Bo Oliver; knew Leonard Semore; I knew the three you have named on November 29, 1933. The night of November 29, 1933, I attended a dance at Butch Allen's place, arriving there about eight-thirty or nine o'clock; my wife and Leonard Semore went with me, she was Leta Smith, we had not married at that time; there was another girl, I believe her name was Mildred Wiley; we went in Leonard Semore's car from my home; Butch Allen lived about seven miles north of Sentinel, a mile west and a quarter of a mile north, that would be northwest of Dill; Roland Semore, Leonard Semore, Leta Smith and Mildred Wiley went to the dance; Bo Oliver was there; during the time I was at the dance I saw Newman Hatcher, Alfred Rogers, Huston Loveall and Leona Cox, but I do not remember seeing Jack Clem; after the dance broke up we started to leave; Bo Oliver told us to get in the car and leave; I got in the car and he told Leonard Semore to leave, and he could not find his keys, so I went back to look for the keys and could not find them; I was looking on the floor of the car for the keys; the car was facing east; it was a Ford roadster, '29 Model; Leonard Semore was standing at the north of the car; Bo Oliver,—I would judge him to be standing about fifteen or twenty feet—when I was looking for the keys; there was a gun fired, I heard the report; I heard Leonard Semore say to Bo Oliver, 'Oh, Bo Oliver, you have shot me.' Leonard fell on the ground and Bo Oliver left; after the shot was fired I heard the gun jam; Bo Oliver had the gun; I don't know where Oliver went when he left the scene of the shooting; the next time I saw him he was in jail here, which was about a month after the shooting. About the time this shooting took

place there was other shooting around there; after this shot was fired the parties all disappeared. Leta Smith, Clarence Semore and wife, and another boy and myself stayed there; after Leonard fell we picked him up and put him in a car, I believe it was Rufus Duncan's car; they took him to Cordell hospital, there was no Doctor in town; we then went to Sentinel, to the hospital, and the Doctor there advised us to take him to a surgeon; we then took him to Dr. Adams' hospital and left him there under Dr. Adams' treatment."

On cross-examination witness stated they were traveling in a Ford roadster.

"Leta Smith is now Mrs. Frank Roberts; Roland Semore is a brother of the deceased. We left from my home to go to the dance. We probably stayed in the house not over thirty minutes; I do not know if any trouble took place between the parties in the house; I do not know if Leonard Semore was put out of the house by anyone that evening; I was not put out; somebody had some trouble just outside of the door but I do not know who it was. Leonard Semore lost the car keys and I was looking for them at the time the shot was fired; while I was down looking for the keys Bo Oliver was out in front of the car; I had a drink of whiskey but I did not have a supply; Roland Semore had some whiskey; Roland was just sitting there in the car at the time the shot was fired; we did not take Roland along with us when we went home, we put him out of the car west of town; I did not roll him out to the side of the road; nobody in the crowd had a gun that I saw that night, and I did not tell anyone that there was a gun in our crowd but I could not tell it, that the county attorney had tied my hands with a statement."

The state called several witnesses who, in substance, corroborated the testimony of Frank Roberts as to being at the dance the night Leonard Semore was killed, and what took place at the car of Leonard Semore at the time Bo Oliver shot him, showing that Roberts was trying to

find the key to the car and that Bo Oliver had demanded him to leave; that Bo Oliver came out of the house swearing, and saying, "Let me to him, let me to him," and finally Bo Oliver shot Leonard Semore, paralyzing his body from where the bullet entered down, and he could not use his legs.

Dr. Adams testified he examined the deceased when he was brought to his hospital, and that the deceased was completely paralyzed, and that no one ever got well from such an injury; that the deceased was apparently better at times and then would be worse, but there never was any chance for him to recover or live with such a gunshot wound.

Dr. J. H. Plunkett, of Wagoner, testified the deceased was brought to his father's home at Wagoner; that he visited him and treated him; that it was the wound or injury that caused the death of the deceased.

Several witnesses, testifying for the state, testified positively that the deceased was not armed at the time the defendant shot him; one or more testifying that he had an empty whisky bottle in his hand.

The record further shows that the defendant immediately left the deceased, and went to South Texas, and remained in hiding from the night of November 29, 1933, until February 23, 1934.

The defendant does not deny he fired a bullet into the body of the deceased, at or near the car of the deceased, on the night of November 29, 1933, but undertakes to justify his action by the following statement:

"I am A. B. Oliver, generally known as Bo Oliver; I am 32 years old; live at Sentinel; married, have a wife and two children; on the night of November 29, 1933, I

went to the dance at Butch Allen's, accompanied by Ick Hatcher, my little nephew, and my little boy; when we got to Allen's place I drove in to the yard on the south side of the house, my car was facing toward the east; I started into the house and Roland and Leonard Semore stopped me at the edge of the house; Roland Semore is in jail, has been in there practically ever since I have been there; we get along nice, I shave him every day; I knew Leonard Semore probably three weeks before the night of the dance; when they met me they offered me a drink of whiskey out of a pint bottle, and I told them I did not want to take a drink; Leonard Semore pulled out his gun and showed me; the Semores appeared to be drunk; after the conversation I went on in the house; I was standing near by when Ick Hatcher and Leonard Semore got into a fuss, something about a tag dance, and Butch Allen told them to go outside; they went outside; there were several others out there and I went out also; they were cussing each other about the tag dance and a woman in there, and Leonard Semore pulled out a gun, and I grabbed the gun, and we had a controversy, and Leonard Semore asked, 'What the hell did I have to do with that,' and I said, 'I did not want to see you have any trouble.' And he said, 'If you grab my gun again I will use it on you.' Finally we all went back in the house.

"Shortly afterwards the dance broke up. Leonard's car was facing the east, he had turned it so he could get out, it was facing south, and on the north side of my car; the south side of his car was probably about ten feet from my car. After the difficulty with Hatcher and Semore my brother-in-law came in and told me that Leonard Semore had said he was going to kill that hair-lipped son of a bitch before the dance is over; after the boys told me that I went to my car and got my gun and put it in my pocket for my protection; it was in my Ford roadster, in a little place I had for it; I had put it in there when I went to Chickasha; I was fixing to go home and asked Leta Smith and Mildred Wiley if they wanted to go home with us; that the boys were drunk; I heard Semore tell Frank Roberts, standing back of my car, 'I am going to

kill that hair-lipped son of a bitch,' and I walked back to my car and he got in his car and reached over in his car, and I said, 'What have you got there, Semore'—and I said, 'Drop it; I will fight you fair,' and he says, 'Get ready to meet your God, you hair-lipped son of a bitch,' and had his gun in his hand, and I shot him once; I did not want to kill him, after I shot him I left, and told my little nephew and little boy to meet me at the corner; I did not want to have any trouble with his brother. I did not surrender to the sheriff then; I started to return home when they caught me."

On cross-examination defendant stated:

"I knew they would have to have me present to have a trial; certainly I am that smart. I left the country immediately after I shot Semore, I left him there to die; you would leave too; when I left he was lying on the ground; I did not hear the deceased say, 'Bo Oliver, you have killed me;' I was not drinking that night; Roland Semore had whiskey and they asked me to have a drink, and I told them no; that is when I saw the deceased with a gun; it looked like a 45, a pocket gun; it wasn't an automatic; he wanted me to help break up the dance; I had seen Leonard Semore a few times before this night and was pretty well acquainted with his brother. Leonard said he had stuff to take in the dance with; I went inside and watched them dance, talked with Mrs. Allen and also Butch; when he pulled his gun on Ick Hatcher I grabbed the barrel of the gun, and he told me, what the hell did I have to do with it, and I told him I did not want any trouble, and he told me if I grabbed his gun again I will use it on you; I did not say anything, but he and Ick argued a little and he walked back and put his gun in his pocket. My nephew is not here. After the difficulty we went back to the house and Hatcher went to dancing. I asked Semore what he had, what have you got there Semore, drop it, and I will fight you fair, but he did not drop it; he said, 'Get ready to meet your God, you son of a bitch;' I then shot him and got my little boy and left. I was caught in Texas, in Floresville; I was gone three months. Q. You

killed this man in self-defense, didn't you? A. Yes. Q. Then you immediately left the country? A. Yes, sir."

Ick Hatcher, testifying for the defendant, stated that he lived at Hobart; he knew the defendant Bo Oliver; that he attended the dance at Butch Allens' November 29, 1933.

"While I was inside dancing I had a little controversy with the deceased; he seemed to be drinking, and commenced to say something to me and I said something back, and he said, 'You are not so damn tough, are you,' and I said, 'No sir;' we had a little fuss and Butch Allen asked us if we were going to have any trouble to go outside, and Leonard Semore went out, and he had something in his hand; after I had the controversy on the outside where Leonard Semore had something in his hand, I went over to the car of Mr. Riggins, I believe it was, and asked him to take me home, and he said he had to go over to Dill."

On cross-examination witness stated he went to the dance with Bo Oliver, and left after the dance was over. "I have been convicted of larceny of domestic fowls."

There was other testimony in behalf of the defendant, and rebuttal, but the foregoing is the material testimony necessary to arrive at an opinion as to whether or not the defendant had a fair and impartial trial, and was accorded all the rights guaranteed to him by the Constitution and laws of the state.

Six errors have been assigned by the defendant alleged to have been committed by the trial court possessing sufficient merit to warrant this court in reversing the case and granting him a new trial. The defendant discusses his fourth assignment of error, that the court erred in overruling plaintiff in error's demurrer to the evidence of the state and in overruling plaintiff in error's motion for a directed verdict.

The defendant discusses his fourth assignment but does not cite any authority in support of his contention. After carefully reading the evidence in the record, the defendant was very fortunate the jury returned a verdict of manslaughter in the first degree instead of murder, as the testimony is amply sufficient to have sustained a conviction of murder, and the court did not err in overruling defendant's demurrer to the evidence and motion for a directed verdict.

The other assignments will all be considered together, as they relate to the question of the competency or incompetency of the testimony admitted or rejected. Without going into detail, we hold that the errors complained of by the defendant are without merit.

The testimony of the witnesses shows conclusively that the defendant in this case brought on the difficulty; that he came out of the house, or out near the car where the deceased was preparing to leave, and demanded that they leave, using language that has not been incorporated in this opinion, but such language as to arouse a person to anger or to create a breach of the peace; that some few words were passed between the deceased and the defendant, and the defendant fired the shot that took the life of the deceased, and the deceased being unarmed, and having nothing in his hand, unless it was an empty whisky bottle, and being several feet from the defendant at the time he fired the shot.

There is not a word of testimony showing any mitigating circumstances, and the testimony of the defendant as to what took place prior to the difficulty, as to the difficulty had by the deceased and Ick Hatcher, is not supported or borne out by the witness Hatcher; Hatcher left the scene before the fatal trouble. If the record shows

anything, it shows the action of a man who was bent on having trouble with some one, and seemed to have selected the deceased as his prey to shoot. No justification is offered excepting the defendant's testimony, which does not bear upon its face the earmarks of truth. Immediately after the shot was fired, the defendant left the scene of the difficulty, and was arrested in Southern Texas a few months later and was brought back to Washita county for trial.

The testimony in this case shows the deceased and the defendant were slightly acquainted, knowing each other for two or three weeks; that the deceased and the defendant had been friends and were friendly when they met. The testimony in this case tends to show the defendant and the deceased had been drinking whisky the evening of the difficulty. The defendant insists that prior to this difficulty, when the deceased and Ick Hatcher were having an argument out in the yard, that the deceased had a pistol drawn, and he caught hold of it to keep the deceased from shooting Hatcher.

Hatcher's statement does not bear out the testimony of the defendant; Hatcher says he had something in his hand; Hatcher's testimony shows that he and the deceased argued there for a while and he went and asked a man who was attending the dance to take him home, and the party replied that he was going to Dill. Outside of the defendant's testimony that some of his relations had reported to him that the deceased was going to kill the defendant, there is not a word in the record to show that the deceased had any ill will against the defendant or that they had any previous difficulty.

The statement of the defendant makes it at least a case of manslaughter in the first degree, the testimony of

the state makes out a case of killing without any provocation or justification, and the defendant was indeed fortunate that the jury did not render a verdict of murder with a sentence to the electric chair. The admission of evidence objected to by the defendant, and urged by him as grounds for reversal, did not prejudice the defendant or deprive him of having a fair and impartial trial. Foreman v. State, 38 Okla. Cr. 50, 259 Pac. 176.

The case is affirmed.

EDWARDS and DOYLE, JJ., concur.