## OSCAR PARIS v. UNITED STATES.

No. A-401.   Opinion Filed May 9, 1911.

(115 Pac. 373.)

1.   WITNESSES—Impeachment—Contradictory Statements. A party
cannot impeach his own witness by proof of prior contradictory
statements, where such party has not been misled by the witness,
and where such witness has not testified to facts which were
injurious to such party. See **Culpepper v. State,** 4 Okla. Cr. 104,
111 Pac. 679.

2.   WITNESSES—Impeachment. Where a party has been deceived
or entrapped into placing a witness upon the stand, having
reasonable ground to believe, and believing, that the witness will
testify to facts favorable to such party, and the witness, when
upon the stand, testifies to facts injurious to such party and
conflicting with previous statements made by such witness, it
would be a perversion of justice to deny to such party the right
to introduce in evidence statements made by such witness, con-
flicting with the testimony so given, which was injurious to such
party. This may be done upon the ground of surprise, to explain
the action of the party in placing the witness upon the stand,
and to destroy the injurious effects of such testimony. See
**Sturgis v. State,** 2 Okla. Cr. 364, 102 Pac. 57.

(Syllabus by the Court.)

*Appeal from District Court, Marshall County; D, A. Richardson,
Judge.*

Oscar Paris was convicted of manslaughter, and appeals.
Reversed and remanded.

*George A. Henshaw, W. I. Cruce,* and *Utterback, Hayes &
McDonald,* for appellant.
*Smith C. Matson,* Asst. Atty. Gen., for the State.

DOYLE, JUDGE.   Upon the trial of this cause, Mrs. Lou
Hartin was the only eyewitness to the killing introduced by the
state.   She testified to a clear case of self-defense upon the part
of the appellant.   For the purpose of impeaching her testimony,
the state then introduced the following affidavit in evidence, which

was admitted over the objection and exception of counsel for appellant:

"Indian Territory, Southern District.

"Lou Hartin being duly sworn, on her oath deposes and says: "'My name is Lou Hartin; my age is 20 years; I live about 1½ miles south of Madill, I. T. I knew J. W. McCarly in his life time. I also know S. O. Paris and J. H. Paris. On Wednesday, April 6, 1904, I think it was, my sister, Mrs. Chas. Gullit, and myself were at our cow lot milking, about 7 o'clock. We heard some horses running on the south side of a branch a short distance south of the lot, coming in the direction of where we were. The first person we saw was Mr. McCarly just as he reached the south side of the branch. He was on horseback and was running his horse. About the same time I saw S. O. Paris and J. H. Paris. Both of the Parises were on horseback and were running their horses, and were going in the same direction that McCarly was going; that is, in a northerly direction. McCarly and S. O. Paris ran down into the branch and came out on the north side. Paris was just a few steps behind McCarly when they came out of the north side of the branch. J. H. Paris did not cross to the north side of the branch until after the killing. After they (S. O. Paris and J. W. McCarly) came across, they ran until they came opposite the cow pen in the road, about 30 steps from where we were. The first words I heard, S. O. Paris ordered McCarly to stop, and repeated the order once or twice, and called McCarly a "God damn son of a bitch." Paris then overtook McCarly and shoved a pistol in McCarly's face. I heard McCarly say to Paris, "Don't." At this time McCarley's left hand was holding his bridle reins, and his right hand was up on the right side of his face, as if trying to shield his face. Paris presented the pistol as described and fired. McCarly fell forward in his saddle, and then fell off his horse. McCarly had no weapon in his hand at any time that I saw them, nor did he make any demonstration. After McCarly fell from his horse, Paris wheeled his horse and ran back in the direction he came. About the time he shot, both horses reared and plunged, and Paris' hat fell from his head. He was still running the last time I saw him. After S. O. Paris turned and ran south from the place of the killing, he passed J. H. Paris just at the north bank of the branch. J. H. Paris came on to where McCarly was lying, and got down and picked up S. O. Paris' hat, and immediately remounted, and turned and ran

in the same direction that S. O. Paris had gone. We girls screamed when the shot was fired, and S. O. Paris turned and looked in our direction and ran. After the Parises ran, we started to our house and just before reaching the house we met Mrs. J. H. Ledbetter and our mother and older sister, when we turned and went back.                    LOU HARTIN.'

"Subscribed and sworn to before me this 17th day of Feb., A. D. 1906. Summers Hardy. [Seal.]"

It was not claimed that the attorneys who represented the state were surprised at the testimony of this witness which was favorable to the defendant, or they did not know when they placed her on the witness stand just what her testimony would be. This question has been repeatedly passed upon by this court before, and it has been decided that such evidence is not competent, unless the party placing such witness on the stand had been misled and entrapped by the witness, and was in good faith surprised at the testimony given. See *Sturgis v. State*, 2 Okla. Cr. 389, 102 Pac. 57; *Culpepper v. State*, 4 Okla. Cr. 121, 111 Pac. 679.

Two things must concur before a party will be permitted to impeach his own witness. First, the party must in good faith be surprised by the testimony of the witness; second, the testimony of the witness must be injurious to such party. If either of these conditions do not exist, it is error to allow a party to impeach his own witness, and if this is done over the objection of the opposite party, and it appears from the record that such impeaching testimony may have influenced the jury, a new trial will be granted. Neither the defendant nor the state has the right to place a witness upon the stand, merely for the purpose of impeaching such witness, or to set up a straw man, simply for the purpose of knocking him down.

Counsel for the state contend that, as the homicide in this case occurred prior to statehood, and in the Indian Territory, the law in force in the Indian Territory should govern at the trial. To this proposition we agree. Section 2016 of the Indian Territory Statutes is as follows:

"The party producing a witness is not allowed to impeach his

credit by evidence of bad character, unless it is in a case in which it was indispensable that the party should produce him; but he may contradict him with other evidence, and by showing that he has made statements different from his present testimony."

This statute provides that where it is indispensable that a party should place a witness upon the stand, then such party may impeach the credibility of such witness by proof of bad character. This is only permitted to be done where it is indispensable that such party should produce such witness. The section then proceeds as follows:

"But he may contradict him with other evidence and by showing that he had made statements different from his present testimony."

As we construe this statute, a party can only show the bad character of his witness where it is indispensable that such party should produce the witness. We do not think that this applies to the latter portion of this statute, and we have not been cited to any authority so holding. We think that it is a fair construction of the Indian Territory statutes to hold that, before a party will be permitted to contradict his witness by showing that he had made statements different from those to which he testified on the witness stand, it must also appear that such party was surprised at the testimony given by such witness. If it had been shown that Mrs. Hartin, at the time of the trial, had misled or deceived the attorneys for the state as to what her testimony would be, then the statute above quoted would have been applicable. But there is no claim that this was done. We held, in *Sturgis v. State* and *Culpepper v. State, supra,* that under such circumstances a party may impeach the testimony of its witness by proof of contradictory statements made by such witness prior to being placed upon the witness stand. It is true that the court in this case did instruct the jury that the affidavit introduced could be considered by them only for the purpose of impeaching Mrs. Hartin. But, in view of the fact that without this impeaching evidence the state entirely failed to prove

a case of guilt against the defendant, we cannot escape the conclusion that the jury disregarded the instructions of the court, and based their verdict upon the affidavit which was offered for the purpose of impeaching the witness. The facts stated in the affidavit may be true, and the testimony of this witness at the trial of this cause may have been false; but, as the affidavit was not competent and legal evidence, we cannot do otherwise than reverse this conviction.

The judgment of the lower court is therefore reversed, and the case is remanded.

FURMAN, PRESIDING JUDGE, and ARMSTRONG, JUDGE, concur.