## TIMMIE FOREMAN v. STATE.

No. A-5908. Opinion Filed Aug. 25, 1927.
(259 Pac. 176.)

Carlile & Wall, for plaintiff in error.

Edwin Dabney, Atty. Gen., and J. H. Lawson, Asst. Atty. Gen., for the State.

EDWARDS, J. The plaintiff in error, hereinafter called defendant, was convicted in the district court of Sequoyah county for manslaughter in the first degree and was sentenced to serve a term of four years in the state penitentiary.

Only two assignments of error are argued in the brief: The first is that the court erred in permitting the state to impeach two of its own witnesses, Bertha Foutz and George Copeland. Bertha Foutz testified in substance that she had known both the deceased and the defendant for four or five years. That she was

present when the homicide occurred. That deceased stopped where defendant was, accused defendant of having his whisky. Defendant said he did not have any. Defendant told deceased to go back, and deceased said that he would get his whisky or cut defendant's throat. That he walked toward defendant with his hands in his pocket. Defendant twice ordered him to stop, and that witness also asked him to stop, and upon his refusal to do so, defendant shot him. She further testified that a short time after the homicide she had signed a statement for the county attorney in which she said that she did not hear anything that was said between the defendant and deceased. That at one time she told the county attorney and sheriff that she did not know anything about the shooting at all. She explained these statements to the officers by saying that she had slipped off from her parents on the night of the homicide to go to a dance and did not want them to know she had been there. The state was permitted to introduce her written statement made to the county attorney in evidence. Where a witness has made a statement which induces the party calling him to believe that he will testify to a certain state of facts, but when called testifies to a different state of facts injurious to the party calling him and conflicting with his previous statements, such party has the right to impeach the witness upon such contradictory statements, and may introduce in evidence statements made by the witness conflicting with his testimony so given, not as substantive evidence as proving the truth of the statement, but as affecting the credibility of the witness. Culpepper v. State, 4 Okla. Cr. 103, 111 P. 679, 31 L. R. A. (N. S.) 1166, 140 Am. St. Rep. 668. It would be a perversion of justice to say that one deceived or entrapped by a witness in this manner may not explain his acts in calling the witness and counteract the injurious effect of his testimony.

Sturgis v. State, 2 Okla. Cr. 362, 102 P. 57; Paris v. United States, 5 Okla. Cr. 601, 115 P. 373.

The impeaching of a witness in such case rests largely in the sound discretion of the trial court. When a contradictory statement is admitted, the trial court should limit and restrict the application of such testimony to impeachment only, but the failure to do this is not necessarily reversible error. Jones v. United States, 14 Okla. 356, 78 P. 100. The same situation exists, except in a less degree, to the testimony of the witness George Copeland.

The other assignment of error argued by counsel for defendant is that the court erred in permitting the county attorney to introduce the purported dying declaration of the deceased. To render a dying declaration admissible, it is essential to prove as a preliminary fact that the declaration was made under a sense of impending death and after hope of recovery had been abandoned. It is not necessary, however, that the injured person should have declared that he is going to die, or that he is without hope. Such belief may be proved by the surrounding circumstances. When a dying declaration is offered in evidence, it is the duty of the trial court to determine its admissibility by first requiring the necessary preliminary proof. This should be made, in the first instance, in the absence of the jury, and then if the court finds it to be admissible, the preliminary proof and the declaration should be given anew before the jury. If it is found insufficient in the first instance, neither the preliminary proof nor declaration is given to the jury. In this case, the preliminary proof is not sufficient to render admissible the declaration. The following is the strongest testimony offered. Mrs. Fronie Gable, mother of deceased, testified:

"Q. You are the same Mrs. Fronie Gable who was on the witness stand while ago, are you? A. Yes.

"Q. Who did you have with Clarence? A. **Dr.** Cheek.

"Q. You stated while ago that Dr. Cheek told you what Clarence's condition was in the presence of Clarence? What did he say his condition was? A. He said the chances were slim for him."

On cross-examination, she said.

"Q. I will ask you to state if Clarence did not think he was going to get well himself at that time? A. No, sir; I don't think he did.

"Q. Do you know whether he did or not? A. No, sir.

"Q. You don't know what Clarence thought— whether he thought he was going to get well or thought he was going to die? A. No, sir."

On redirect:

"Q. Well, did he talk to you at Ft. Smith? A. He said that he might never get up.* * *"

Dr. Cheek testified:

"* * * Q. What would you say as to the probability of one shot in those parts, of his chances of living? A. There was one shot that made it almost impossible for him to live.

"Q. I will ask you to state if you told Clarence Gable that he could not get well? A. I did."

On cross-examination:

"Q. When did you tell him that? A. At different times.

"Q. You were never quite able to make him believe it, were you doctor? A. I never had any talk to him that it would kill him.

"Q. And he always—you say that you never at any time told him that it would kill him? A. No. I told him that it was impossible for him to get well. That he would always be paralyzed.

"Q. Always be paralyzed from the waist down? A. Yes, sir.

"Q. And you never told him that he was going to die? A. No, sir."

H. D. Pitchford, county attorney, testified:

"Q. Do you know that he was conscious? A. Yes, sir.

"Q. How do you know it? A. Talked to him.

"Q. Had you ever talked to him before? A. Yes, sir.

"Q. Down here at—where? A. Down here at Norris.

"Q. And he refused to make a statement there to you, didn't he? A. He did not.

"Q. Did he talk perfectly normal? A. He did.

"Q. And he was bound to have been in his right mind? A. Yes, sir."

The dying declaration is as follows:

"Ft. Smith, Arkansas, 12—29—24. Statement of Clarence Gable, taken at Ft. Smith, Ark., on December 29th, at 4:20 p. m. I feel pretty bad and do not know when I will get up and may be never. I have no use of my legs. I am shot in three different places, one shot in the neck, one through the right lung, and one through ribs on right side. I had been to a dance at Bill Rolands and coming home, Jim Jackson, George Copeland, and myself were walking in head, and I stopped, and Timmie Foreman and Bertha Foutz came up, and I took a step or two towards them, and Timmie pulled his gun, and I said 'There's no use of that,' and he started to shooting. We had not been fussing, and I did not have a gun or knife or any kind of weapon, and I did not say anything to him or do anything to cause him to shoot me. Timmie had a half gallon of whisky, and we both took a drink or two out of it, but neither of us were very drunk. I realize I am pretty bad off and may not get well, and with that in mind I make this statement in the presence of Miss Eva Atwood, of Ft. Smith, Ark., Mrs. Fronie

Gable, and Harry D. Pitchford, county attorney of Sequoyah county, Okla.

"[Signed] Clarence Gable.

"Witnesses: Eva Atwood. Fronie Gable. Harry D. Pitchford."

The dying declaration is not competent under the proof made. The only matter for our determination is whether admitting of it in evidence requires a reversal.

Section 2822, Comp. Stat. 1921, is as follows:

"No judgment shall be set aside or new trial granted by any appellate court of this state in any case, civil or criminal, on the ground of misdirection of the jury or the improper admission or rejection of evidence, or as to error in any matter of pleading or procedure, unless, in the opinion of the court to which application is made, after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right."

Under this section of the statute, where a defendant is clearly guilty, this court has frequently held that it should not reverse a judgment on account of an error which does not deprive him of some substantial, material right. Maynes v. State, 6 Okla. Cr. 487, 119 P. 644; Koozer v. State, 7 Okla. Cr. 336, 123 P. 554; Atchison v. State, 3 Okla. Cr. 296, 105 P. 387.

The defendant in giving his version of the homicide testified:

"Q. He came back there where you were? A. Yes, sir.

"Q. What did he say? A. He came up and asked about the whisky. Asked me what did I do with it, and I told him I didn't have none of his whisky.

"Q. What did he say? A. He accused me of having it, and told him I didn't have it and told him to go on, and he wouldn't do it, and I asked him again—I asked him twice, and this girl asked him to go on, and

I asked him again, and he followed me up, and I told him that I didn't want to have no trouble and that I would talk to him about it some other time, and I told him—

"Q. Where did he have his hands? A. When he first came up he had his hands in his pocket, and when he walked up he pulled his hand out.

"Q. Tell the jury what happened from there on? A. When he pulled them out, that is when I began telling him to leave me alone—I asked him three times to leave me alone, and go on back, and the kid asked him once, and I shot him, and after he fell I went up and asked if he wanted me to take him home and that I was sorry I had done it and wouldn't have done it, if I hadn't had it to do. * * *

"Q. How come you to shoot him, Timmie? A. Well, I knew he was fussy, and these boys had told me about what he was going to do, I did not know whether he had this knife or not, and I did not want him to get to me because I did not want him to hurt me—

"Q. Did you shoot to kill him? A. No, sir, I shot at his arm.

"Q. What happened when you shot the first time? A. Nothing, he didn't move, or nothing. Well, he just stood there. He didn't fall or nothing, and after I shot the next shot he kinder stepped or stooped over, and the next time he fell."

The defendant then testified as follows:

"A. I was not drunk, I just barely felt it. I just had a drink or two."

On cross-examination, the defendant was asked how far he was from Clarence when he shot him, to which he answered:

"A. I don't know. I guess as far as from here to the table. I do not know how many feet; 10 or 12.

"Q. When Clarence came up, he was 10 or 12 feet from you? A. No, sir; not when he first came up there.

"Q. How far was he from you when he first came up? A. He was right up in reach of me.

"Q. When he first come up? A. Yes, sir; and he followed me up. I backed off from him.

"Q When did you get 10 or 12 feet away? A. I was 10 or 12 feet from him.

"Q. He was right up at you at first, wasn't he? A. I said 10—

"Q. He was right at you, wasn't he? A. No; he wasn't in reach of me.

"Q. He never did get in reach of you, did he? A. No, sir; never did get in reach of me.

"Q. Then you started to backing back and got 10 or 12 feet away? A. He kept following me up, and I told him to stop. * * *"

"Q. I will ask you if Clarence Gable didn't fall in the middle of the road? A. Well down across the road, something like that. * * *

"Q. And you were away over there on the bank? A. Yes, sir, at the edge of the road.

"Q. That is 10 or 15 steps, the bank is, you mean the embankment of the creek? A. This little hill there.

"Q. Ten or 12 feet from where you shot him? A. Something like that. I wouldn't say. * * *"

These excerpts from his testimony, with other parts not quoted, disclosed that deceased and defendant had been friendly. Both were drinking. Deceased was 10 or 12 feet from defendant, who was standing still and had no weapon visible and was making no attempt to injure him. They had had no previous difficulty of any kind, and the testimony of defendant makes it at least a case of manslaughter in the first degree. Since the punishment assessed is the minimum, the admitting in evidence

of a dying declaration could not have been prejudicial and was harmless error.

The case is affirmed.

' DOYLE, P. J., and DAVENPORT, J., concur.