# HUGH LEE McCOMBS v. STATE.

No. A.-9951.   March 4, 1942.

(123 P. 2d 301.)

Willis R. Stark, of Oklahoma City, for defendant.

Mac Q. Williamson, Atty. Gen., J. Walker Field, Asst. Atty. Gen., and Lewis R. Morris, Co. Atty., of Oklahoma City, for the State.

BAREFOOT, P. J.   Defendant, Hugh Lee McCombs, alias Buster McCombs, alias H. L. McCombs, was charged in the district court of Oklahoma county with the crime of murder, was tried, convicted of manslaughter in the

first degree and sentenced to serve a term of four years in the penitentiary, and has appealed.

Eleven assignments of error were made in the petition in error, but in defendant's brief only two are presented for a reversal of this case. They are:

First. Error of the court in permitting the state to impeach the testimony of its witness by introducing a written statement made by said witness to police officers outside the presence of the defendant.

Second. There was insufficient evidence on the part of the state to sustain a conviction on the charge of first-degree manslaughter, and the court erred in refusing to sustain a demurrer to the evidence and in not directing a verdict of not guilty.

The second proposition will be first considered.

The charge in this case was the result of the death of Jimmy O'Brien in the three-room house of Cleo and Maude Farris at 615 South Walnut avenue, in Oklahoma City, on the night of February 6, 1940, at about 5:30 o'-clock p. m. Present in the house at the time of the killing besides defendant and deceased were Mack McCombs, a brother of defendant, Cleo Farris and Maude Farris, his wife, Pauline Clark, James Roy Devanie, and Juanita Howell. These parties were all present when the deceased, Jimmy O'Brien, entered the room. All testified that he was drunk at the time he came in and that he wanted to buy whisky. Mack McCombs, the brother of defendant, was sitting on a divan, and he asked deceased to quit cursing and get out. Deceased rushed at Mack McCombs, and they engaged in a fight or tussle. At this time defendant entered the room from the kitchen and said, "I will take him." There is some conflict in the evidence as to just what the defendant did, but it appears from the record that defendant struck deceased and kicked

him in the face and in the side. Deceased left the room and lay down by the side of the house. He was taken in an ambulance to the hospital and died, as the doctor testified, as the result of a punctured lung caused by a broken rib. The doctor's statement was as follows:

"Q. Tell the court and jury as best you can to laymen what you found when you opened up the man's skull and chest and abdomen? A. Well, he had so many bruises and contusions about his face that it wasn't certain whether he had possibly a fractured skull, that was the reason the head was opened, thinking maybe he had a hemorrhage into the brain, but there was no evidence of any hemorrhage to the brain. Then when the chest was opened the fifth and sixth ribs on the left side of the front part of the chest were fractured and the left lung was collapsed and he had had a hemorrhage into the left part of his chest in what they call the pleural cavity, and there was nothing abnormal about the abdomen. Q. Was there anything in there that would help you know how the left lung was collapsed, what happened in order to get him in that condition—what I am getting at is whether or not the ribs were so dislocated that they punctured the lung? A. Not at the time I saw him, but they could have been. Q. That could have been from a heavy blow on the outside? A. Yes, sir. Q. In your opinion, is that what collapsed the lung? A. In my opinion, I believe the rib punctured the lung and that is what collapsed it. Q. Tell the court and jury what caused the man's death? A. His death was due to a hemorrhage into the pleural cavity. Q. And that hemorrhage was from this collapse of the lung? A. Yes. Q. And you think the broken ribs probably or possibly did that? A. Yes, sir. Q. And those were caused by blows from the outside onto the body? A. All his wounds were external; yes, sir."

There was evidence that deceased had two ribs broken and that he was a prize fighter. There was much evidence offered and also pictures which showed the wounds on deceased's body and face. It is unnecessary to further

quote from it. It was somewhat conflicting, but most of the witnesses were in sympathy with the defendant. However, from the evidence as a whole, there is not shown any justification for the action of the defendant. The deceased was drunk and was having a tussle with the brother of the defendant. There is no evidence that the deceased was armed in any way or that the brother of the defendant was in immediate danger of receiving great bodily harm or of suffering death. The evidence does not reveal there was any intention on the part of the defendant to take the life of the deceased. His acts can only be judged by the results. The jury heard the evidence and evidently took all of these facts and circumstances into consideration. Their verdict was for manslaughter in the first degree with the minimum punishment. Under the law it is not necessary that there be an intent to kill to be guilty of manslaughter in the first degree. There was no evidence that defendant was acting in self-defense or that it was justifiable homicide, or that the killing was accidental. The jury having passed upon the evidence under the issues presented and proper instructions of the court as to the law, we cannot say that the evidence was insufficient to sustain the verdict and sentence, and that the court erred in refusing to sustain the demurrer to the evidence or in refusing to direct a verdict of not guilty.

The second assignment of error is based upon the testimony of the witness Pauline Clark. She was called as a witness by the state. She had previously made a written statement the second day after the killing, and the county attorney was in possession of the same. When she testified differently from what had been made in the written statement, the county attorney confronted her with the written statement. Counsel for defendant objected to the question propounded by the county attorney

upon the gorund that the written statement was the best evidence. The record reveals the following:

"Q. I will ask you to state this, if you didn't state this, or this in substance, in a written statement to the police—. Mr. Stark: If the court please, the statement to the police is the best evidence in this case and we are going to object to the county attorney reading from any statement unless it is introduced. Mr. Marlin: As I understand it, a written statement is not admissible if the witness is introduced, but since he asked about the statement I will offer it in evidence as State's Exhibit No. 8. Mr. Stark: We object to it as incompetent, irrelevant and immaterial, and an attempt to impeach this witness on a collateral matter to the actual facts in the case. The Court: Objection overruled. Mr. Stark: Note our exception. The Court: Now, that statement is for that purpose only. Mr. Stark: We object to it for the further reason that the statement to the police officers is hearsay. The Court: Well, the county attorney didn't offer it until you raised the objection; overruled."

The witness was questioned as to the written statement, and she admitted the truth of practically all the written statement. We hardly think that counsel should be permitted to object to the questions asked by the county attorney and demand that the written statement was the best evidence and should be introduced and, when it is offered in evidence, then object to its introduction. We have carefully examined the record and do not think there was an attempt by counsel for the state to impeach the witness. As before stated, her evidence was practically the same as that made in the written statement. There was no substantial variance. Counsel for defendant was permitted to fully cross-examine the witness with reference to the preparation and signing of the written statement. This court has often held that the state or defendant may impeach a witness where such witness be-

comes hostile or surprises counsel which results in counsel being misled by the witness.

In Foreman v. State, 38 Okla. Cr. 50, 259 P. 176, 177, this court said:

"It would be a perversion of justice to say that one deceived or entrapped by a witness in this manner may not explain his acts in calling the witness and counteract the injurious effect of his testimony. Sturgis v. State, 2 Okla. Cr. 362, 102 P. 57; Paris v. United States, 5 Okla. Cr. 601, 115 P. 373.

"The impeaching of a witness in such case rests largely in the sound discretion of the trial court. When a contradictory statement is admitted, the trial court should limit and restrict the application of such testimony to impeachment only, but the failure to do this is not necessarily reversible error. Jones v. United States, 14 Okla. 356, 78 P. 100. The same situation exists, except in a less degree, to the testimony of the witness George Copeland."

In the Foreman Case the court permitted the state to introduce in evidence the written statement made by the witness.

Finding no error in the record, it is the opinion of the court that the judgment and sentence of the district court of Oklahoma county should be affirmed, and it is so ordered.

JONES and DOYLE, JJ., concur.