## JOE DUNHAM v. STATE.

No. A-10175. Dec. 1, 1943.

(141 P. 2d 855.)

L. Keith Smith, of Jay, and R. A. Wilkerson, of Pryor, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DOYLE, J.   Plaintiff in error was convicted on an information filed in the district court of Delaware county March 12, 1941, which, omitting formal parts, charged: "that Joe Dunham did, in Delaware County, and in the State of Oklahoma, on or about the 2nd day of February, in the year of Our Lord, One Thousand Nine Hundred and Forty-one, and anterior to the presentment hereof, commit

the crime of Murder, in the manner and form as follows, towit: Said defendant, Joe Dunham then and there being was then and there wilfully, wrongfully, unlawfully, and feloniously operating and propelling a motor vehicle, towit: One 1933 Model Chevrolet coupe, upon a public highway while under the influence of intoxicating liquor, from a point known as Connie Martin's beer tavern, on state Highway No. 20, near Jay, Oklahoma, to another point near Eucha, in Deleware County, Oklahoma, and said defendant, then and there being, then and there driving, operating and propelling said motor vehicle while under the influence of intoxicating liquor as aforesaid did, wilfully, unlawfully, wrongfully, and feloniously operate and propel said motor or vehicle in such manner as to cause the said vehicle to overturn and wreck, inflicting upon the body and person of one George Hughes, certain mortal wounds and injuries from which the said George Hughes did, on February 2nd, 1941, die, contrary to," etc.

Upon trial he was by the verdict of the jury found guilty of "manslaughter in the First degree as charged in the information herein". But were unable to agree upon the punishment.

His motion for new trial was overruled; May 20, 1941, the court rendered judgment and sentenced the defendant to imprisonment in the State Penitentiary for the term of four years.

On November 7, 1941, an appeal was perfected by filing in this court a petition in error with case-made attached.

The record shows that when judgment was rendered the defendant gave notices of his intention to appeal. The court fixed the amount of the appeal bond at $3,000, which was given and approved May 24, 1941.

It is first contended that the court erred in overruling the demurrer to the information and defendant's objection to the introduction of evidence on the ground that the facts stated do not constitute a public offense.

In Maney v. State, 53 Okla. Cr. 438, 13 P. 2d 597, this court held:

"An information which informs the accused of the offense with which he is charged with such particularity as to enable him to prepare for his trial, and so defines and identifies the offense that, if convicted or acquitted, he will be able to defend himself against any subsequent prosecution for the same offense, is sufficient."

In Clark v. State, 63 Okla. Cr. 138, 73 P. 2d 481, this court held:

"It is not necessary to allege and prove that the homicide was perpetrated without a design to effect death, where one is charged with murder while engaged in the commission of a felony."

And see Harry v. State, 59 Okla. Cr. 302, 58 P. 2d 340; Martin v. State, 35 Okla. Cr. 248, 250 P. 552; Warren v. State, 24 Okla. Cr. 6, 215 P. 635.

It follows that the information in this case is sufficient and the court did not err in overruling the demurrer thereto.

The two other assignments of error argued in the brief require a brief statement of the evidence.

It appears that on February 1, 1941, the defendant, Joe Dunham, Tobe Reasor and George Hughes borrowed a trailer truck from Connie Martin to make a delivery of posts, which they had made, to Salina. In taking the same to Salina they had to go to Pryor to collect their pay for making the posts; there the payment check was cashed. Before starting back to return the truck to Connie Martin, the defendant, Dunham and George Hughes bought a pint

of whisky and on their way from Salina to Johnson's Service Station at the "Y" they drank the whisky, arriving at Connie Martin's about 9 o'clock p. m., they there drank beer. They left Martin's place in a Chevrolet coupe, owned by the defendant. Tobe Reasor was driving the car and the defendant, Dunham, Hughes and a girl named Frankie Fern Quick were in the car. After going south on Highway No. 10 for about a mile they stopped the car and the boys left the car and behind a stump near the highway picked up a bottle. When they came back to the car, the defendant Dunham took the wheel and was driving. Other stops were made and they were fussing and quarreling. Frankie Fern Quick was sitting in the middle, Tobe Reasor on the right side, with George Hughes sitting in his lap. They proceeded on until they came to a turn in the road, there on account of the defendant's intoxicated condition the car turned over in such a manner that George Hughes was crushed to death under the car, and Tobe Reasor's right leg caught in the door of the car and he lay there for about an hour until help came to release him.

Roy J. Durnil testified:

"I live in Jay, engaged in the funeral business. On February 2, 1941, I was called to the place of the accident on the highway between Jay and Eucha, coming there about 4:30 in the morning I found the body of George Hughes lying by the side of the car. His head was badly bruised, also his right knee and left hip, and on his chest was a bruise that caused his death."

Frankie Fern Quick testified that:

"My age is 18 years, I was working at Martin's tavern when these boys arrived around 9 o'clock p. m., they stayed there until 12:30; I left with the boys." Witness then describes the drive from the tavern to the scene of the accident. That at the time of the accident Joe Dunham was driving the car, that he was intoxicated when they left the

tavern; that after going a short distance down Highway No. 10, they stopped the car and the boys got out and picked a brown bottle up near a stump and brought it back to the car; Joe Dunham got under the wheel and was driving; a difficulty arose between Joe Dunham and Tobe Reasor, they got mad at each other and were quarreling. This kept up until the wreck occurred. That she got out of the car and she ran to Mr. Gee's house to tell that George Hughes was under the car; that she was trying to get out of the car just before this happened.

Tobe Reasor as a witness for the state testified:

"My age is 22 years, I have lived near Eucha almost all my life; I am not married; my brother-in-law, Joe Dunham and I lived together, and the last three weeks of his life, my uncle George Hughes lived with us. The morning before the accident we worked cutting posts until about noon when Joe and George went to Jay in Joe's Chevrolet Coupe and borrowed a trailer from Connie Martin. They got back about 2 o'clock and we loaded up our posts, and took them to Salina but had to go to Pryor to get the money, the check was made out in Uncle George's name, he cashed it and we started back with the trailer. We stopped at Salina and bought some groceries and an axe, I do not know whether or not Joe and Uncle George bought a bottle of liquor in Salina, I would not say for sure whether they took a drink before we got to the beer joint, we changed a tire at Johnson's, I imagine we got to the beer joint about 10 o'clock, Frankie Fern Quick was there and she left there with us, I was driving Joe's car, we all three boys drank one bottle of beer at the beer joint, my uncle George called me outside and offered me a drink of whisky and I took one. I would not say whether Joe Dunham took a drink or not, I do not remember. I drove the car. The first time we stopped was not very far from where we turned off the Main Highway. I sat in the car. George Hughes and Joe Dunham got out, it was dark, if they had anything with them when they got back in the car I did not see it. The next stop Joe Dunham got under the wheel, the next stop the lights went out; Joe Dunham

was under the wheel, and that was when we had the accident."

The next assignment is based upon the following proceedings:

"Q. You state now your lights went out before the accident? A. Yes. Q. I will ask you if you didn't make a statement about this case in the presence of this officer here, and Mr. Arl Fox, and myself, and Mr. James I. Monroe, and Lillian Wilson, about this case? A. Well when I made this statement out I don't know whether they were true or not, because I wasn't in very good shape to make them. Q. State whether or not those statements were read to you? Mr. Wilkerson: Objected to: Leading and suggestive. The Court: Sustained.. Mr. Hunt: Comes now the State of Oklahoma, and announces it has been surprised by the testimony of this witness; that in a statement made immediately after the accident this witness testified differently to what he is testifying now, and that statement was made under oath, and we ask permission to cross-examine this witness. The Court: You may cross-examine the witness upon that point. Q. I want to ask you if in the presence of this Highway Patrolman, Marion Son, and Guy Hendrick, of Pryor, and Riley Hunt, if this question was asked you and this answer made, in the county attorney's office, on the 2nd day of February, in Jay, Okla.: 'Q. Were the lights burning good, and if your answer was not, "Yes, but it was foggy and we didn't have any windshield wiper." Did you or did you not make that answer to that question?' Mr. Wilkerson: That is objected to for the reason not proper impeaching question; and the further reason the time and place when the lights were burning good isn't shown. The Court: You will have to read four or five previous questions. Q. I will ask you if you made the following answers to those questions, in the presence of those people, as follows: Q. How long did you lay there? A. About two hours. Q. Did you talk to anybody? A. Yes, but I didn't know who it was, some men. Q. Did he ever complain about the way Joe Dunham was driving? A. No, sir. Q. Did this girl even complain to you about the way you were

driving? A. No. She said to drive slow, it was foggy. Q. Lights burning good? A. Yes, but it was foggy and we didn't have any windshield wiper. Q. Brakes work good? A. Pretty fair. Mr. Smith: Comes now the defendant and objects to the purported statement being read to the witness and jury, and objects to the cross-examination for the reason that portion of the statement read shows that the answers of Tobe Reasor in the statement referred to the condition of the lights all of the time when he, Tobe Reasor, was driving the automobile, and the questions propounded to Tobe Reasor upon which the county attorney sought to examine this man, was a question as to the condition of the lights at a time when Joe Dunham was driving the automobile, and shortly prior to the accident. The Court: Overruled; that is a question for the jury to determine. Q. Tell the jury whether or not those questions were asked you and whether or not those answers were made? A. Well I guess that is right. Q. The Court: You can ask him as to that part. Q. State whether or not those questions and answers just read to you were read, at the time of making this statement, and prior to the time you signed it? A. Well I think I read some of them. Q. State whether or not you read those questions and answers? A. Yes, I remember some of them. Of course I don't remember all of them."

Marion Son, highway patrolman, testified:

"I live at Pryor, and was called to the scene of an accident seven miles southwest of Jay, near the town of Eucha, on the 2nd day of February, 1941, Deputy Sheriff Fox and Riley Hunt, county attorney, were with me; it was in the morning, around 10 o'clock. The top of the car was on the left shoulder of the road, the car had apparently gone up on the right-hand side of the road against a steep bank, and turned over on its right side, headed southwest, I saw Joe Dunham at the scene of the accident, he came walking up the road from the southwest, I was present at a conversation had between Deputy Sheriff Fox, county attorney Hunt and myself in a highway patrol car, at the scene of the accident. Joe Dunham was advised of

the fact that he did not have to say anything if he so desired, that he had a right to have a lawyer present before he said anything, and that anything he did say could be and would be used against him in court. He was asked if he had been drinking, he answered, 'We were all drinking beer'. Asked how much he said, 'I don't know'. He was then asked if he was drunk, and he said 'We were all feeling pretty good,' that 'Frankie Quick got with us at the beer joint, and she was tight when he left the beer joint, that Reasor was driving, Frankie in the middle and George was in my lap, after stopping when we started again, George was driving, later he told us he was driving, then he said, 'I will tell you the truth, I was driving when the accident occurred.' He was asked what happened and he said, 'I don't know, I just lost control of the car.' Asked as to whether or not there was any mechanical defect in that car which had caused the accident he said 'that the car was in pretty good shape.' "

Art Fox, deputy sheriff, Delaware county, testified that he was called to the scene of the accident about 5 o'clock in the morning. The body of George Hughes was lying beside the car, that he came in and called the highway patrol and notified the county attorney and they went with him to the scene of the accident. His further testimony is substantially the same as that of Marion Son.

G. W. Sumner testified:

"I live south of Rattlesnake Hollow, this side of Eucha since January 4th, Joe Dunham came to the west gate at my house and was hollering, I got up and answered him, he wanted to know if he could get some help about a car wreck, that the car was on a man's foot. I called my son-in-law, and we went over there, the accident occurred about three hundred yards northwest from where I lived. Asked: 'Did you observe whether or not he was drunk?' Answered 'He didn't show any drunk to me.' "

The defendant did not testify in his own behalf.

Arthur Johnson, on behalf of the defendant, testified:

"I operate a filling station at the 'Y'; I recall when Joe Dunham and George Hughes stopped there just before 11 o'clock that night and pawned a pickup wheel for some gas, and Joe Dunham paid me something over two dollars. Tobe Reasor was with them. I don't think Joe Dunham was at that time under the influence of intoxicating liquor."

Nora Martin, wife of Connie Martin, testified that she lived on a farm a mile south of Jay. That these boys came there about 10 o'clock and left there about 1 o'clock, that she served them sandwiches and coffee when they arrived and later on her daughter served them the same way. She further testified: "I think Joe Dunham was sober, if he was under the influence of intoxicating liquor I could not tell it, if he was."

Joe Martin testified that he was tending bar at Martin's Tavern that night; that he saw Joe Dunham and the other two boys there that night about midnight, Joe Dunham bought some beer and just as they closed up the place they bought food. Asked: "Was Joe Dunham under the influence of intoxicants in any manner at that time," answered: "No sir."

On cross-examination he stated that probably around 50 people patronized the place that night.

Connie Martin testified:

"That Dunham, Reasor and Hughes came to his place about 10:30 or 11 o'clock, stayed for a couple of hours, maybe longer, Joe Dunham bought two bottles of beer and bought coffee and sandwiches; that he noticed his conduct and conversations. Asked: 'Tell the jury whether or not Joe Dunham was under the influence of intoxicating liquor that night while there?' Answered: 'No, he was not drunk, nor was he under the influence of it."

Cecil Gee testified that he lived in Rattlesnake Hollow; was called and went to the scene of the accident. Mr. Sumner was there, a man was pinned in the door of the car. In 15 or 20 minutes Joe Dunham arrived and with other help they succeeded in removing these men from and under the car; that he heard Dunham talking to others there and was close to him; that Joe Dunham then asked him to go after the undertaker and officers. Asked from his observation of Joe Dunham there at that time, "State whether or not he was under the influence of intoxicating liquor in any manner," answered: "Not that I could tell." That Eucha was something like a quarter of a mile from the scene of the accident.

Frank Hampton testified that he lived in Rattlesnake Hollow, and on the night of February 2nd went to the scene of the accident; that Cecil Gee and Joe Dunham were there, and with others they removed two men who had been pinned under the car and in it.

He further testified that Joe Dunham did not walk like a man that was drunk, and that he could not smell any liquor about him, and he did not think he was under the influence of any intoxicants in any manner.

Pete Lane testified that Joe Dunham came to his house to get him to help in connection with the wreck and he went to the scene of the accident with him, and that he was not drunk, that he could tell at all, and that he did not smell any liquor on his breath.

The record further shows:

"Mr. Hunt: It is hereby agreed by and between the state and defendant, that after said defendant Joe Dunham appeared at the house of G. W. Sumner, that Henry Partain, Roe Cary, and Frank Lane if called as witnesses would testify that they saw the defendant after Mr. Sum-

ner saw him, and that he was not drunk, and that they smelled nothing on his breath; we stipulate and agree that he was not drunk at that time, and that you could not smell anything on his breath, and don't desire to contradict that. Mr. Smith: With that stipulation the witnesses named may go. Mr. Smith: The defendant rests. Mr. Hunt: No rebuttal evidence, Your Honor. Mr. Smith: Comes now the defendant at the conclusion of all the evidence and again moves the court to direct the jury to return a verdict of not guilty. The Court: Motion overruled. Mr. Smith: The defendant accepts."

The transcript of the testimony covers 150 pages, but the foregoing is a substantial statement of all the evidence in the case.

. The second assignment is:

"That the court erred in permitting the county attorney to impeach or attempt to impeach the state's witness Tobe Reasor, over the objections of this plaintiff in error, which were duly excepted to at the time."

We think this assignment is without merit.

In the case of Foreman v. State, 38 Okla. Cr. 50, 259 P. 176, this court held:

"Where a party has placed a witness upon the stand believing that he will testify to a given state of facts by reason of testimony given or statements made, ·and the witness then testifies to a different state of facts injurious to the party calling him and in conflict with his previous testimony or statements, the party placing such witness upon the stand may impeach his testimony. This may be done upon the ground of surprise and to explain the placing of the witness upon the stand and to counteract the injurious effect of his testimony."

Judge Edwards in the opinion of the court says:

"Where a witness has made a statement which induces the party calling him to believe that he will testify to a

certain state of facts, but when called testifies to a different state of facts, injurious to the party calling him and conflicting with his previous statements, such party has the right to impeach the witness upon such contradictory statements, and may introduce in evidence statements made by the witness conflicting with his testimony so given, not as substantive evidence as proving the truth of the statement, but as affecting the credibility of the witness. Culpepper v. State, 4 Okla. Cr. 103, 111 P. 679, 31 L. R. A., N. S., 1166, 140 Am. St. Rep. 668. It would be a perversion of justice to say that one deceived or entrapped by a witness in this manner may not explain his acts in calling the witness and counteract the injurious effect of his testimony. Sturgis v. State, 2 Okla. Cr. 362, 102 P. 57; Paris v. United States, 5 Okla. Cr. 601, 115 P. 373."

In the case of Donahue v. State, 38 Okla. Cr. 87, 259 P. 179, this court held:

"Where a party has placed a witness upon the stand, having reason to believe that he will testify to a given state of facts, and the witness then testifies to a different state of facts, the party calling him as a witness may show his previous statements for the purpose of affecting his credibility and to explain the reason for placing him on the stand and to counteract the injurious effect of his testimony."

The only other assignment argued is that the verdict of the jury is not supported by sufficient evidence.

It is argued that the defendant's witnesses and their testimony, including that of the witnesses named in the stipulation, stood uncontradicted by the state at the time of the submission of the case to the jury.

The established rule is that this court will not disturb the verdict where there is competent evidence reasonably tending to sustain the same.

In the instant case both parties agreed that the issue was a question of fact as to whether the defendant was under the influence of intoxicating liquor while driving the automobile on the highway when the wreck occurred. It was a question as to the credibility of the witnesses, and the jury having believed the testimony of the witnesses for the state, there is nothing for this court to do except to affirm the judgment of the lower court.

As is said in the case of Bayless v. State, 9 Okla. Cr. 27, 130 P. 520, 521:

"The jury are not bound to believe testimony because it is uncontradicted, and not directly impeached. The credibility of the witnesses testifying in behalf of defendant is the exclusive province of the jury to determine; and, although such testimony may be uncontradicted and not directly impeached, when there are facts and circumstances admitted and proven tending to lessen the probability that such testimony is true, the jury may give it such weight as they deem proper, even to the extent of wholly disregarding the same. Wainscott v. State, 8 Okla. Cr. 590, 129 P. 655."

It follows that, in the absence of errors of law, apparent in the record, prejudicial to the rights of the defendant, the judgment of conviction should be affirmed.

Upon a careful examination of the record, we find no such error. The judgment of the district court of Delaware county herein is therefore affirmed.

JONES, P. J., and BAREFOOT, J., concur.