Eugene D. HICKS, Plaintiff in Error,

v.

M. K. & O. TRANSIT LINES, INC., a Corporation, and Andy James Fryar, Defendants in Error.

No. 39308.

Supreme Court of Oklahoma.

Dec. 27, 1961.

C. Lawrence Elder, and James E. Poe, Tulsa, for plaintiff in error.

Rucker, Tabor, Best, Sharp & Shepherd, Bryan W. Taber, Joseph A. Sharp, and O. H. "Pat" O'Neal, Tulsa, for defendants in error.

BLACKBIRD, Vice Chief Justice.

This appeal involves an action by plaintiff in error, as plaintiff, to recover damages for personal injuries he suffered while a passenger in a bus driven by Mr. Andy Fryar, and operated in the City of Tulsa by M. K. & O. Transit Lines, Inc., when he was thrown from his seat to the floor of the bus at, or about, the time that the bus, and an auto driven by Mr. John Clifford Lay, collided at the intersection of Gillette Street and Admiral Boulevard, in said City. The bus was traveling west toward downtown Tulsa, on Admiral Boulevard. Lay's auto was traveling north on Gillette Street, which has stop signs requiring vehicles on it to stop before entering its intersection with Admiral Boulevard.

In his petition filed in October, 1958, plaintiff named both the aforesaid bus line and its driver as defendants, and charged them with negligence in failing to keep a proper lookout, in failing to stop the bus before the collision, in failing to exercise the high degree of care required of defendants for the safety of passengers, and in violating the following provisions of Tulsa's City Ordinances:

Ordinance No. 7110, Art. 7,

Sec. 61: "(a) No person shall drive a vehicle in the City of Tulsa on public property or private property open to public use other than at a careful, prudent and reasonable speed not greater than nor less than reasonable and proper in due regard to visibility, weather, traffic, conditions, mechanical condition of the vehicle, width and condition of roadway and all other conditions then existing which in any way might affect the operation of the vehicle.

Sec. 63: "(c) A speed greater than twenty (20) miles per hour in the Central Business District is unlawful.

Sec. 64: "(f) Any speed greater than that which will enable the driver of a vehicle to stop within the assured clear distance ahead is unlawful."

In their answer, defendants alleged, among other things, in substance, that as far as they were concerned, the accident was unavoidable and caused—not by any fault of theirs—but by the independent, intervening negligence of the motorist John Clifford Lay, by reason of which defendants were confronted with a sudden emergency, after which they used good judgment in attempting to avoid the accident. Among the Tulsa City Ordinances which defendants pleaded Lay had violated, is Article VII, Sec. 44(c), which reads:

"(c) The driver of a vehicle at a stop sign shall stop in a position where he has complete visibility to the right and left of the intersection and having so stopped shall yield right of way to all other vehicles already in motion in the intersection or so close as to constitute an immediate hazard."

According to the undisputed evidence adduced at the trial in March, 1960 the acci-

dent occurred at 4:25 P.M., when evening traffic from the west, or from downtown Tulsa, to its residential areas, was becoming heavy. For the control of such traffic on Admiral Boulevard, there is a traffic light at its intersection with Lewis Avenue, which is one block east of the Admiral-Gillette intersection. Due to the fact that this light had changed from green to red, just before the accident, there was, along the northern side of several motor vehicles parked parallel to the south curbing of Admiral Boulevard, a continuous line of eastbound motor vehicles extending from that traffic light, back west from it, more than a block. When Lay, after stopping his auto at the stop sign on Gillette Street, drove it north on that Street into its intersection with Admiral Boulevard, he "threaded" it through a gap, the width of Gillette Street, in the aforesaid Admiral Boulevard line of traffic stopped by the Lewis Avenue traffic light. He testified that, while his car was stopped at the stop sign on Gillette, he had no difficulty in seeing to his right, east on Admiral, but he admitted he could not see all the way east to Lewis Avenue. He further testified that before the collision occurred he never saw the bus approaching from the east on Admiral.

According to the testimony of the plaintiff, defendants' west-bound bus reached Lewis Avenue, on Admiral Boulevard, many blocks after he boarded it; and when it approached the traffic light at the intersection of these two streets, the light's amber glass was shining, so the bus speeded up to get past said intersection before said light changed from amber to red; and it did not stop until the collision with the Lay car. Plaintiff testified, in substance, that in his opinion the bus was traveling "thirty to thirty-five miles an hour" while crossing that intersection; and, when asked if he had an opinion as to the bus's speed in the next block west of said intersection " * * down near the accident, but just before * * *" the bus's brakes were applied, he answered: "Oh, probably the same speed, thirty."

The testimony of other witnesses called by plaintiff, including another passenger on the bus, tended to corroborate plaintiff's testimony that, immediately before the collision, the bus was traveling at a higher rate of speed than prescribed by Section 63(c) of Art. 7, Ordinance No. 7110, supra, but the only one, to which we need to specifically allude, was Mrs. Alva Bailey. During her direct examination, she was neither interrogated, nor testified, as to any fact bearing upon the speed of the bus, the cause of the collision, or any negligence, or lack of it, on the part of either the bus driver or the motorist Lay. In other words, her testimony was absolutely negative as to the material facts concerning either of those subjects, or issues. Figuring prominently in her cross examination however was a written statement concerning the accident, she had previously signed. The statement, in handwriting, and marked as Defendants' Exhibit No. 1, was as follows:

"Feb. 7, 1958
Tulsa, Okla.

"My name is Mrs. W. M. (Alva) Bailey. I am a married American female, 54 years of age. I live at 1714 E. 32nd St. No. (C H21620)

"On Feb. 1, 1958 at about 5:00 P.M. I was a passenger on an MK & O Bus when it was involved in an accident. I was *sitting down in the first seat* behind the back door on the right side.

"I don't know what happened but suddenly the bus slowed and swerved and I hit the left side of my face on a steel bar, I also wrenched my right knee.

"*I really don't believe that the bus driver was at fault. He was driving slowly and watching what he was doing.*

"I didn't see the other car which hit the bus until after I was hurt.

"Have you Read The
Above? ——————Yes.

"Is it True & Correct? —————— Yes.

"Signed Mrs. Wm (Alva) Bailey." (Emphasis ours).

Mrs. Bailey's cross examination by Mr. Best, counsel for defendants—sometimes interrupted by Mr. Elder, plaintiff's attorney—is in material part as follows:

"* * * Q. * * *, Mrs. Bailey, * * *, I hand you what has been marked as defendants' exhibit 1. Is this your signature?

"A. That's right.

* * * * * *

"Q. And did you make this statement?

"A. I guess I did.

* * * * * *

"MR. BEST: * * * We offer this in evidence, your Honor.

"MR. ELDER: We object to it as being incompetent, irrelevant and immaterial.

* * * * * *

"THE COURT: I will sustain the objection at this time, unless you want—well, it wouldn't be in any way impeachment of her testimony.

* * * * * *

"Q. —What was the speed of the bus?

"A. I really couldn't say.

"MR. ELDER: Object to that as improper cross examination. I didn't go into that.

"THE COURT: Well, overruled.

"MR. ELDER: Exception.

"A. I wouldn't know.

"Q. You have no idea at all—

"A. I have no idea.

"Q. —whether he was going fast or slow?

"A. To be frank, the woman I was sitting with, we were talking—

"Q. Excuse me. Do you have any judgment whether he was going fast or slow?

"A. I said *I don't have any idea how fast it was going.*

"Q. Couldn't you tell this jury what the bus driver was doing, wheth-er he was watching the bus and watching where he was going or whether he wasn't?

"A. *I couldn't tell that* because I was sitting on the south side of the seat and I was looking at the woman on the other side and we were sitting talking.

"Q. Is your answer no?

"A. No, I couldn't tell them how fast it was going.

"MR. BEST: All right, we offer this portion of the statement as impeachment of the witness' testimony.

"MR. ELDER: We object to it, your Honor.

"THE COURT: Well, don't read it. Let me see it again.

"MR. BEST: Right here.

"THE COURT: Well, I think you can ask her that, if she didn't make that statement.

"MR. BEST: All right, sir.

"THE COURT: Because that is only a portion of this statement.

"Q. Yes, sir. I will ask you please, ma'm, if you made this statement, 'I really don't believe that the bus driver was at fault. He was driving—' "

* * * * * *

"MR. ELDER: It is invading the province of the jury.

"THE COURT: No, I don't think so.

"MR. ELDER: Give me an exception.

"THE COURT: No, it is for impeachment purposes. She said she didn't see the driver.

"Q. —'he was driving slowly and watching what he was doing'. Did you make that statement?

"A. No, I didn't.

"Q. You did not?

"A. No.

"Q. Did you sign this?

"A. I signed this here. * * *."

A colloquy between the court and counsel for the respective parties shows that the

jury, during its deliberations, requested, and was allowed, to take to the jury room Mrs. Bailey's entire statement and that of another of plaintiff's witnesses signed many months before the trial, without ever having been given any instructions restricting the purpose for which said statements might be considered.

At the close of its deliberations, the jury returned a verdict for defendants, and judgment was entered accordingly. After the overruling of his motion for a new trial, plaintiff perfected the present appeal.

 Among the arguments advanced by plaintiff for reversing the judgment appealed from is, in material substance, the following:

That said court erred in admitting into evidence Mrs. Bailey's hereinbefore quoted ex parte statement of February 7th, 1958, concerning the accident; and allowing defense counsel to cross examine her with reference to same. We think this argument has merit for several reasons. As hereinbefore indicated, when Mrs. Bailey's cross examination commenced, her testimony on direct examination had tended, in no degree, or extent, whatsoever, to establish whether the collision, and plaintiff's injury, was caused by negligence on the part of Lay and of the defendants, or either of them. Consequently, her said testimony was in no manner damaging to defendants on that issue, which had been made the crucial one in the case. Under the rule as to a party's impeachment of his own witness, the tendency of the testimony—whose effect is sought to be destroyed by impeachment—to damage his case, is an essential prerequisite to the right to impeach him. As stated in the syllabus of the case of Sturgis v. State, 2 Okl.Cr. 362, 102 P. 57, 58, the rule is:

> "When contradictory statements made by a witness are admissible in evidence for the purpose of impeaching him, they must be confined to contradictions of the testimony of the witness *which are injurious to the party seeking to impeach him,* * * *."
> (Emphasis ours).

In applying the rule to that case, the court explained (p. 68):

> " * * * when McKinley was examined in chief by the county attorney, and before the effort to impeach him had been made, the witness had not stated a single fact favorable to the defendant or anything inconsistent with the testimony of the other witnesses for the state. His evidence was negative, and he only failed to swear what the county attorney desired him to testify to. Under these conditions, the statements made by the witness out of court, injurious to defendant, were not admissible in evidence, because he had not testified to a single fact which injured the state's case.
>
> * * * * * *
>
> "If this testimony was competent at all, it was competent for no other purpose than that of impeaching and contradicting McKinley, and the court should have so instructed the jury. Who can say but that the jury did not consider this testimony as original substantive evidence, * * *. They would be warranted in so considering it after the court had refused in their presence to limit the scope to that of impeaching and contradicting McKinley.
>
> * * * * * *
>
> "If the state has the right, upon the plea of impeaching its own witness, to introduce statements made by such witness * * *, and thus get hearsay before the jury, as original substantive evidence against a defendant, then in all fairness and justice we would be compelled to hold that the defendant had the same right. The far-reaching and ruinous consequences of such a rule are manifest. A defendant could place a witness upon the stand and, after asking him a few general questions, could then ask the witness if he had not made a statement (giving the statement * *) to the defendant, and other persons, *which would constitute a complete defense."* (Emphasis ours).

In reviewing decisions by appellate courts of other states on the matter, the court in the above-quoted case (p. 69) further stated:

"The Supreme Court of Indiana in the case of Blough et al. v. Parry et al., 144 Ind. [463] 468, 469, 40 N.E. [70] 72, said: 'Where a witness does not testify to anything prejudicial to the party calling him, there can be no object in impeaching him. * * * Such testimony, though not beneficial, is not prejudicial, and, therefore, no reason exists for impeaching the witness. The witness, Emma Norris, did not testify to the facts sought to be proven by her, and *therefore no right arises to impeach her* for her failure to testify to such facts.'" (Emphasis ours).

In Paris v. United States, 5 Okl.Cr. 601, 115 P. 373, 374, 375, it was said:

"Two things must concur before a party will be permitted to impeach his own witness, * * *; second, *the testimony of the witness must be injurious* to such party. If either of these conditions do not exist, it is error to allow a party to impeach his own witness, and if this is done over the objection of the opposite party, and it appears from the record that such impeaching testimony may have influenced the jury, a new trial will be granted. Neither the defendant nor the state has the right to place a witness upon the stand, merely for the purpose of impeaching such a witness, or to set up a straw man, simply for the purpose of knocking him down." (Emphasis ours).

See also Maddox v. Commonwealth, 311 Ky. 685, 225 S.W.2d 107; Commonwealth v. Buzard, 365 Pa. 511, 76 A.2d 394, 22 A.L.R.2d 846, 853; Webb v. City of Seattle, 22 Wash.2d 596, 157 P.2d 312, 158 A.L.R. 810, 819, 820; Schneiderman v. Sesanstein, 121 Ohio St. 80, 167 N.E. 158, 64 A.L.R. 981, 986, 987, and other cases cited in the Annotation at 74 A.L.R. 1042, 1064 ff.

 We cannot say what Mr. Best's purpose was in cross examining Mrs. Bailey

as to the subject ex parte statement. We do know, however, that, as a result thereof, incompetent statements were gotten before the jury, which, if believed, established that defendants were not at fault in the accident, formulated for them a complete defense to the action, and may have been a major factor in their being exonerated by the jury's verdict. This case demonstrates that the same harmful consequences of a party attempting to impeach his own witness without just cause, can result from his adversary doing it. We see no reason why the rule should not apply to the latter situation, as to the former; and we so hold. It follows, therefore, that the trial court erred in allowing defense counsel, over plaintiff counsel's objection, to interrogate Mrs. Bailey as he did, concerning the written statement of February 7th, 1958. Of course, we cannot say with certainty what effect the statement had upon the verdict, but, since the evidence was conflicting as to whether negligence on the part of defendants, or Lay, was the proximate cause of the accident, we say, as the court did in Tennison v. St. Louis-San Francisco Ry. Co., Mo., 228 S.W.2d 718, 721 (cited in Hayes v. Kansas City Southern Ry. Co., Mo., 260 S.W.2d 491, 495) that it may well have been highly prejudicial. To paraphrase the court's language in Wiese v. State, 47 Okl.Cr. 59, 287 P. 1099, 1102: No one can say that the jury did not consider the (inadmissible) representations contained in the statement * * * (of Mrs. Bailey) made out of court as original or substantive evidence. After the court admitted it, the jury would have been warranted in considering it, and especially would this be true *when the court had failed in its instructions to limit the scope of that statement* * * *.

For the foregoing reasons, we think the trial court should have sustained plaintiff's motion for a new trial; and we so hold. His order and/or judgment overruling it is therefore reversed, and this cause is remanded to said court with instructions to grant a new trial.