JOHN W. STRICKLAND v. STATE.

No. A-6918. Opinion Filed Jan. 25, 1930.
Rehearing Denied Feb. 15, 1930.
(284 Pac. 651.)

Cargill & Whiteside, for plaintiff in error.

The Attorney General and Smith C. Matson, Asst. Atty. Gen., for the State.

CHAPPELL, J. The plaintiff in error, hereinafter called defendant, was convicted in the district court of Oklahoma county on a charge of murder, and his punishment fixed at imprisonment in the state penitentiary for life.

The evidence of the state, in substance, is that the killing occurred in a rooming house operated by defendant at 108½ West California street, Oklahoma City. Irene Summers, the deceased, had been an inmate of defendant's rooming house prior to this time, but for several months immediately preceding the day of the killing she had been staying with her mother in another part of the city.

At about 5 o'clock in the morning on the day of the killing, the defendant went to the home of deceased's mother, got deceased, and took her to the rooming house. Deceased stayed there that day in the room occupied by defendant, and it was in this room that she was shot and killed at about 5:30 that evening. The record discloses that deceased and defendant had been drinking prior to the killing. Defendant admitted that he had taken a few drinks that day, and one of his witnesses testified that the deceased was drunk at the time of the killing. Callie Glenn, a witness for the state, testified that she was present in the room; that deceased was sitting up in the bed and that she saw the defendant point the gun at deceased and fire. The physical facts of the killing corroborate this witness. The defendant admits that the killing was done with a pistol which he had purchased that day and a short time previous to the killing, from a hardware store located on the floor below the rooming house; that he went into the room where deceased was, with the pistol in his hand; and that the deceased grabbed the pistol out of his hand and committed suicide by shooting herself.

The transcript of the record presents a clear case of conflicting evidence. It was up to the jury to believe Callie Glenn supported by the physical facts in the case, or believe the defendant supported by the testimony of a Mrs. Brousseau. The jury has determined this issue against the contentions of the defendant. The jury had all these witnesses before it and had opportunity to observe them as to their manner of testifying and to judge of their credibility and the weight to be given their evidence. There being sufficient evidence in the record to form a basis for the verdict of the jury, the cause comes to this court to be considered only upon the errors of law which the defendant contends occurred at the trial of the case and

which prevented him from having that fair and impartial trial guaranteed him by the laws and constitution of this state.

The defendant first contends that the court erred in overruling his motion for new trial on the ground that the jury were prejudiced against him by having read a certain editorial in the Oklahoma City Times. Defendant complains this editorial had been read by some members of the jury after taking of evidence had commenced but before the final submission of the case. In support of this assignment of error the defendant called one of the jurors, Mr. O'Sullivan, who on direct examination testified as follows:

"A. No; if you read that article, Mr. Wright, there isn't anything in it about the case; it was about incompetent jurors and let you go through and say, when we were admonished not to read anything about the case and I, personally, had anything in the editorial and I wouldn't expect to see anything in the editorial and we got in the case before I found out what it was all about.

"Q. Were you laboring under any fear of intimidation because of having read that article, Mr. O'Sullivan? A. From what?

"Q. The reading of the article in the paper, did that create in your mind any fear of intimidation or threats? A. No, sir.

"Q. Did that reading of that article deter you in any way in the discharge of your duty as a juror? A. Not a bit."

The defendant called no other jurors to testify upon this motion. The editorial complained of contains no comment on the case as affecting the merits of the case and the guilt or innocence of the defendant, but is a discussion of the jury system and of the difficulty of procuring com-

petent jurors to sit, not only in the case at bar, but in all other cases. The general rule is stated in 16 C. J. p. 1081.

"The mere fact that jurors read newspapers during the trial of a case is not of itself ground for disturbing the verdict if the newspapers contain no comment on the case in hand."

"And even when the jurors receive newspapers containing accounts of, or comments on, the case, the verdict will not be disturbed if the papers contain nothing calculated to mislead or improperly to affect their minds or to prejudice their verdict."

In the case of Allen v. State, 13 Okla. Cr. 395, 164 Pac. 1002, 1004, L. R. A. 1917F, 210, this court said:

"Finally it is contended that other misconduct of the jury should reverse this judgment. This assignment of error refers to the fact that during recesses taken during the progress of the trial the jurors were permitted to have access to certain local newspapers concerning statements of other homicides committed in Oklahoma county while the trial of this case was in progress, and also during a recess some of the jury saw the sheriff come into the courthouse carrying a hat and two butcher knives, and one of the jurors spoke to him and asked him if that was all he got, and he replied, 'No, I got one dead one and five live ones.' It is asserted that this conduct is such as to greatly prejudice this defendant and deprive him of a fair and impartial trial. While the conduct of the juror in yelling to the sheriff as he was passing through the courthouse is subject to criticism, and is such as the trial court should always rebuke should attention be called to it, nevertheless we cannot see wherein this defendant's substantial rights were prejudiced thereby. Our statutes (sections 5899, 5900, and 5937, Revised Laws [1910]) provide that there shall be no communication with the jury after it has been impaneled and sworn to try the case by any person on any subject connected with the trial itself, and if such a communication is had it is ground for new trial, and the verdict should be set aside. In this case it

is shown conclusively that no person was permitted to communicate with the jury upon any subject connected with the trial, and it is also shown that the newspapers which the jurors were permitted to read contained no statement with reference to this particular trial; that such matters were torn or cut out of the papers before they were handed to the jurors. No statutory right of this defendant therefore was violated, the jury did not discuss these outside matters in any way, and it does not appear that the defendant was probably injured by such alleged misconduct; but on the other hand the testimony of the persons called by the defendant in support of the motion for new trial, in our opinion, shows that no injury was occasioned this defendant by any of these matters set forth in the motion."

There being nothing in the editorial complained of that constituted a comment on the facts in this case, and there being no showing that the jury or any individual member thereof was influenced to bring into the court any different verdict than the one that was returned, the reading of the editorial by the jurors could not have been prejudicial to the rights of the defendant.

The defendant next complains of improper examination of witnesses by the county attorney. The questions complained of were similar to the following: "Do you remember about Irene Summers being killed?" There was no controversy but that the deceased was killed, either by herself or the defendant. Merely asking the witness if he had heard about the deceased being killed, without stating whether by the defendant or by her own hand, was not an assumption of any disputed fact in the case. The questions were merely preliminary, and the objection is without merit.

It is next contended that the trial court erred in refusing to permit John Long and Dr. C. E. Clymer to testi-

fy as witnesses for the defendant that the wounds upon the deceased could have been self-inflicted. As to the testimony of Dr. Clymer, the record discloses that he gave the following testimony:

"Doctor, I want to ask you if it's possible for an individual inflicting wounds upon their body, in committing suicide, to inflict more than one mortal wound.

"Mr. Wright: To which we object as being incompetent, irrelevant, and immaterial.

"The Court: Overruled.

"A. Yes, sir."

Dr. Harbison and Dr. Haskett were permitted to testify to the same effect. The defendant attempted to prove by the witness John Long as to just how a member of the police force of Oklahoma City had committed suicide. Such evidence was immaterial and would tend to prove nothing as to how the deceased, Irene Summers, met her death; the two events being entirely disconnected.

The trial court refused to let the witness Long testify on the subject that he did permit the doctors to express an opinion on because the witness Long was not qualified to express an opinion on the subject. This court does not hold that it was proper to permit the defendant to introduce the opinions of these doctors as to the probability of suicide of the deceased, but since the opinions were in favor of the defendant, he will not be heard to complain.

In the case of Addington v. State, 8 Okla. Cr. 703, 130 Pac. 311, this court said:

"Exclusion of Evidence—Harmless Error. The exclusion of evidence to prove particular facts is harmless, if the facts sought to be proved are subsequently proved by other evidence, and it is apparent that the evidence

excluded could not have changed the result." Rogers v. State, 9 Okla. Cr. 277, 131 Pac. 941.

The defendant next complains that the court erred in permitting the defendant to be impeached by proof of conviction of a misdemeanor in the police court of Oklahoma City, by keeping a disorderly house.

Section 1891, C. O. S. 1921, provides as follows:

"Any person who keeps any disorderly house, or any house of public resort by which the peace, comfort or decency of the immediate neighborhood is habitually disturbed, is guilty of a misdemeanor."

Section 1501, C. O. S. 1921, defines crime as follows:

"A crime or public offense is an act or omission forbidden by law, and to which is annexed upon conviction, either of the following punishments:

"First, Death.

"Second, Imprisonment.

"Third, Fine. * * * "

Section 585, C. O. S. 1921, provides as follows:

"No person shall be disqualified as a witness in any civil action or proceeding, by reason of his interest in the event of the same, as a party or otherwise, or by reason of his conviction of a crime; but such interest or conviction may be shown for the purpose of affecting his credibility."

The question presented is the right of the state to show that the defendant had been convicted of a crime under the terms of a city ordinance, where the same was an offense under the state law. This court has repeatedly held that where the defendant has been convicted of a crime that fact may be shown. Davis v. State, 15 Okla. Cr. 386, 177 Pac. 621; Whitlow v. State, 24 Okla. Cr.

307, 218 Pac. 162; Smith v. State, 34 Okla. Cr. 396, 246 Pac. 1104.

Under the sections of the statutes above quoted, it is only necessary to show that the defendant has been convicted of a crime. It would not be proper to introduce proof of petty offenses defined by city ordinance, such as running stop lines, overparking, and the like, which are not made crimes by state law, to discredit the witness. It is the taint of conviction for crime which discredits the witness, and not the tribunal in which the conviction was had. Keeping a disorderly house is a crime under the state law, and a conviction for such crime may be shown irrespective of what tribunal the same was had in, for the purpose of discrediting the witness.

It is next contended that the court erred in permitting the state on cross-examination of Mrs. Brousseau, a witness for the defendant, and the proprietress of the building in which the defendant's rooming house was located, to make inquiries concerning the fact that this witness and the defendant were then jointly enjoined in the federal court from maintaining a liquor nuisance in said building.

The extent, manner, and course of the cross-examination of a witness is largely a matter of discretion for the trial court, and the exercise of that discretion, unless flagrantly abused, will not be reviewed on appeal. Yingling v. Redwine, 12 Okla. 64, 69 Pac. 810; Winfield v. State, 18 Okla. Cr. 257, 191 Pac. 609.

The previous occupation, companions, and associates of a witness are proper subjects of inquiry for the purpose of affecting his credibility. Terry v. State, 7 Okla. Cr. 430, 122 Pac. 559; Irvine v. State, 10 Okla. Cr. 4, 133 Pac. 259.

It is competent on cross-examination to prove by a witness any fact which tends to show bias, prejudice, friendship or enmity, or the relationship of the witness to one of the parties to the case. Castleberry v. State, 10 Okla. Cr. 504, 139 Pac. 132; Phillips v. State, 20 Okla. Cr. 415, 203 Pac. 902; Orr v. State, 21 Okla. Cr. 189, 205 Pac. 941; Hennessee v. State, 29 Okla. Cr. 72, 232 Pac. 856.

The fact that this witness had been enjoined together with the defendant from operating a liquor nuisance at 108½ West California, the place where this homicide occurred, was a circumstance which the jury had a right to consider in determining the credit that would be given to her testimony. It tended to show her intimate relationship with the defendant in the conducting of an unlawful business at this place; it also tended to show her own business or occupation, and under the holding in the foregoing opinions of this court was proper.

The physical facts in this case clearly corroborated the witness Callie Glenn and unerringly point to defendant's guilt. It was his gun, and he admits that he walked into the room with it immediately before the shooting. The deceased was a frail woman, and it seems preposterous to conclude that the deceased forcibly wrenched this pistol from defendant's hand and then committed suicide and in so doing fired two shots into the wall above her head before hitting herself. The issue of whether this was a homicide or a suicide was fairly submitted to the jury under the instructions of the court. Under the evidence and the law as given them by the court, they found that the deceased came to her death from gunshot wounds inflicted by the defendant. There is ample evidence in the record to support the verdict of the jury.

For the reasons stated the cause is affirmed.

EDWARDS, P. J., and DAVENPORT, J., concur.