## CHAMBLESS v. STATE.

No. A-11057.   Feb. 15, 1950.

(214 P. 2d 947.)

424

Dave Tant and Thad Klutts, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

JONES, P. J.  The defendant, Orval Lindsey Chambless, was charged by an information filed in the district court of Oklahoma county, with the crime of murder, in which said information it is alleged that on January 8, 1947, the said defendant did unlawfully kill one Wilbert Charles Eltzroth.

Upon trial to a jury, the defendant was found guilty of manslaughter in the second degree with the punishment left to the court.  The defendant was thereupon sen-

tenced to serve three years in the State Penitentiary, and has appealed.

The deceased was shot at the home of the defendant in Oklahoma City, about 6:30 a. m., and died about 24 hours later in Wesley hospital. The defendant admitted shooting deceased, but contended that it was an accident.

For a reversal of the conviction, the following propositions are presented:

1. The evidence is insufficient to support the verdict.

2. The court erred in permitting the state to cross-examine its witness, Robert Scott.

3. The court erred in permitting the defendant to be cross-examined concerning alleged police court convictions.

4. The court erred in inquiring of the jury during its deliberations relative to its numerical division.

There is little dispute in the evidence. The state necessarily had to rely upon witnesses which were very friendly to the defendant. The proof showed that the defendant Chambless, the deceased Eltzroth, Stella Orrell, Robert Scott, and Mary Lou Smith, a daughter of Stella Orrell, met at the Golden Pheasant cafe in Oklahoma City, about 2 a. m. on January 7, 1947. Eltzroth had been drinking. Stella Orrell and the defendant came into the cafe together. All of the parties had been acquainted for over a year. The Golden Pheasant cafe closed about 3 a. m., and the parties went across the street to Bishop's waffle house. There Robert Scott and Eltzroth got into an argument, and their talk became so loud that the cashier of the cafe told them to quiet down or leave; the party then left to go to Chambless' house at 2914 Northwest

17th street in Oklahoma City. Chambless, Mrs. Orrell, Mary Lou Smith, and Scott got in the car of Chambless. The deceased, who had been drinking heavily, drove his own automobile. On the way to the Chambless home, the people in the Chambless car left the daughter of Mrs. Orrell at her apartment. After arriving at the Chambless home, the parties had a few more drinks of intoxicating liquor (a picture of the livingroom of Chambless' home, taken early the next morning after the homicide by the police photographer, showed two empty pint whisky bottles sitting on a tray and three quart-size bottles of either whisky or brandy, two of them partially filled sitting on the floor and another on a dressing table).

Scott, Mrs. Orrell, and the defendant, all testified that the conversation was friendly for several minutes, but that later Eltzroth and Scott got into an argument; that one word led to another until finally Eltzroth jumped out of his chair and said to Scott, "Go ahead and pull your knife" and then patted himself on the pocket and said, "I've got this and I will blow your brains out"; that Chambless told the deceased to sit down, and the deceased took his seat; that later Eltzroth commenced arguing again with Scott, at which time the defendant told him that if he had a gun to take it outside and put it on the porch, or go put it in his car, or leave.

As to what then occurred, Scott testified:

"Q. Then what happened? A. Bill told him he didn't have to do either one. Q. What did Bill do then when he said he didn't have to do either one? A. He said he got it for protection and he wasn't afraid to use it; that is what he got it for to carry, and he didn't intend to put it in his car. Q. Then did Bill go back and sit down? A. He sat down about twenty-five or thirty times. Q. Sat up and down about 25 or 30 times? A. Just up and down. Q. Then what happened? A. Mr. Chambless stepped over

the coffee table, or jumped over it, as it was not tall, probably stepped over it, and started toward the bedroom-bathroom door, which is very close together. Q. Did he say anything when he did that? A. Well, he told Bill he would have to put the gun out, and Bill said he didn't have to do no such thing. He said 'That leaves me only one thing.' So, he went over to the bathroom—went to the bedroom door rather, I believe it is, Chambless said, 'that only leaves me one thing' he said, 'there is only one out then,' or something to that effect."

Scott further testified that Chambless stepped through the bedroom door and that Bill Eltzroth started following after him; that when Eltzroth got in the door, the shot was fired.

He further testified:

"Q. What was Bill doing when the shot was fired? A. Well, I couldn't see nothing but his back. Q. What was he doing? A. He was—all I could tell, was just looking at his back, I couldn't say that he was doing anything. Q. He was not doing anything? A. He was not doing anything with his back. I don't know what he was doing with his hands because I couldn't see them. Q. How many shots were fired? A. Only one. Q. Just one. What happened to Bill when that shot was fired? A. He fell. Q. You and Bill had had lots of arguments, hadn't you? A. Yes, sir. Q. The fact of the matter is every time he started drinking you argued, didn't you? A. Just about, yes, sir. Q. Did you ever have any trouble besides argument? A. No, sir. Q. Did you ever see Bill Eltzroth with a gun? A. Not unless he had one that night."

After the shooting occurred, Eltzroth was taken to Wesley hospital in Chambless' automobile. The defendant and other parties gave blood transfusions, but Eltzroth died about 24 hours later.

Mrs. Orrell and Mrs. Esther Blair testified for the defendant that the deceased, just shortly before his death,

told them at the hospital that he was sorry this had to happen and that it was an accident; that he did not blame the defendant.

On cross-examination of Mrs. Blair, she admitted that when she was questioned by the officers on January 11th in the office of the county attorney, she did not relate the statement which Eltzroth had made to her; and defendant admitted that Mrs. Orrell stayed with him, although not married to him, and that they had their names listed as Orval and Stella Chambless on the mailbox in front of the Chambless home.

Chambless testified substantially the same as Scott and Mrs. Orrell concerning the events that transpired prior to the shooting. He testified that he was afraid that Eltzroth would shoot somebody and that he kept patting his side to indicate that he had a gun.

As to the actual circumstances of the shooting, the defendant testified on direct examination as follows:

"So, he started arguing with Bob again and patting his pocket and arguing. I think all together I asked him four or five times to leave and I told him the last time, 'I am not kidding, Bill, I mean it, it has gone far enough.' He said, 'No; I am going to see this damn thing to an end if I have to kill every son of a bitch in this room.' 'Bill', I said, 'You don't leave a fellow much choice, do you?' At that time he got up out of his chair and I jumped across the table. Well, in line between where I was sitting and the door way there is a bedroom I should judge it is four, four and a half, maybe five feet from where he was sitting, as I went by I hit him almost hard enough to knock him into the wall. Q. You say you hit him? A. Ran into him. Q. You didn't attack him with your fists? A. No, it looked like he ran out there to grab hold of me, but he never made much effort to grab me and as I went through the door I grabbed to the door kind of slammed it behind me. `

"I looked down there and I seen that rifle lying underneath the edge of the bed, and so I thought I would pick that up, reopen the door and I didn't know Bill was right on top of me then. I just opened the door, spoke to him through there and told him 'Now you get out of my house if you are going to act up like that.' Q. (By Mr. Lipe) What? I couldn't understand that? A. 'Get on out of my house if you are going to act up like that.' That is what I had in mind, but I raised the gun up started out like this and he is right on me, but he runs into it pushes me back on the bed and then I came forward again, he reaches out momentarily took hold of the end of the gun and jerked it and it was happening pretty fast then. I jerked back, I believe he jerked it twice and when I jerked it back the second time it went off and when it did it scared me and I took the gun and threw it back over around my side over my shoulder or something, I threw it towards the bed, and I didn't touch it. No one touched it since then. I don't know where they found it but after he started falling to his knees, he said 'Lindsey, why did you do that?' I said, 'My God, Bill that was an accident. I had no intention of doing that.' "

On cross-examination he testified:

"Q. Where was Bill Eltzroth when you got up to go in to get the gun? A. That was one of the times when he was sitting down. Q. He was sitting down when you got up to go in to get the gun, is that right? A. He had just set down about whenever I started to get out of my seat on the divan there. He started right out. Q. Then just tell me again what happened, from the time you were sitting on the divan, on the east side of the divan from then until you killed him? A. I jumped up—I jumped the coffee table—well, jumped and stepped semi over it and started for the bedroom, he started at the time for me to follow me or something, and just after I muttered, 'You don't leave a fellow much choice'— Q. Take your hand away, please, I can't hear you? A. Just after I said, 'You don't leave a fellow much choice,' why I said, 'The best thing you can do is to get on out the door and

let us alone. You have made enough trouble here tonight,' I was mumbling that as I went through loud enough for him to hear and when I got through there and glanced down there and seen that rifle I jerked it up with the intention of bluffing him out of the house."

None of the witnesses for either the state or the defendant saw the deceased with a gun the night of the fatal shooting. Robert Scott who had roomed with the deceased for several months admitted that Eltzroth did not own a gun. He further testified that Eltzroth had become an increasingly harder drinker, and that when he was drunk, he was quarrelsome.

The police officers testified to the investigation which they made and identified certain pictures of the interior of the home of defendant which were taken by the police photographer the next morning after the shooting occurred.

The officers did not find a gun at the home of defendant except the rifle which was used by the defendant, and the evidence showed that no gun was found on the deceased. The physical fact that deceased was actually unarmed probably influenced the jury to disbelieve the statement of defendant and his friends that Eltzroth continually patted his coat pocket and claimed to have a pistol.

It should be borne in mind that the defendant was convicted of manslaughter in the second degree, which meant that the jury found that the killing of Eltzroth was because of the culpable negligence of the defendant. Under the defendant's own testimony, the jury could reasonably have concluded that he was culpably negligent in the handling of the loaded .32 calibre Winchester rifle around a drunk person. The policeman and other witnesses all testified that the defendant did not appear to

be drunk. The defendant had the rifle in his hands. It was a lever action hammer gun which could not be discharged until the hammer was pulled back to a firing position. The defendant said the deceased grabbed hold of the end of the barrel and jerked. If he did, he certainly was barehanded. It may be true that defendant seized the loaded rifle for the purpose of attempting to bluff the deceased into leaving the house, but, under all the facts and circumstances of the case, it would appear that the jury was justified in concluding that the death of Eltzroth was caused by the culpable negligence in which the defendant handled the deadly weapon.

The language used by this court in disposing of a similar contention in the case of Hovis v. State, 83 Okla. Cr. 299, 176 P. 2d 833, 836, is likewise applicable to this case. It was therein stated:

"In the case of State v. Gallagher, 4 Wash. 2d 437, 103 P. 2d 1100, it is stated:

" 'Accused's killing of deceased by the use of more force than was necessary in attempting to expel deceased from accused's home would constitute "manslaughter", in the absence of justification or excuse.'

"22 O. S. 1941 § 745 provides:

" 'Upon a trial for murder, the commission of the homicide by the defendant being proven, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable.'

"In this case, the killng of deceased is admitted. The proof of the state did not show that the defendant was justified in taking the life of the deceased. When the defendant under this statute seeks to prove circumstances

of mitigation or that justify or excuse his act, it generally raises an issue of fact for the determination of the jury."

It is next contended that the court erred in permitting the prosecution to cross-examine the witness, Robert Scott. Throughout all of the direct testimony and cross-examination of Scott, it was clearly apparent that he was friendly to the accused. On cross-examination, Scott had testified that there had never been any trouble prior to the night of the fatal difficulty between Chambless and Eltzroth, and that they had never had any quarrels or hard feelings. On redirect examination, the prosecutor asked concerning a fight allegedly had between Chambless and Eltzroth the preceding summer, and Scott answered that he had never seen or heard of such a fight. The assistant county attorney then stated:

"Mr. Lipe: The state pleads surprise and asks permission of the court to cross-examine on that statement, based on the testimony he made before the Criminal Court of Appeals. Mr. Tant: We object to that. He is not allowed to cross-examine his own witness. He put him on the stand. (Consultation between court and counsel.) The Court: The objection is overruled with exceptions. Q. (By Mr. Lipe) Now, I will ask you if you were not asked this question 'Did you know anything about the fight they had last summer?' Mr. Tant: We make the same objection, incompetent, irrelevant and immaterial, prejudicial and not proper redirect examination. The Court: Overruled with exceptions. Q. (By Mr. Lipe) And you answered the question, 'Heard about it but I didn't see it.' Mr. Tant: We make the same objection to that, hearsay. The Court: Overruled with exception. Q. (By Mr. Lipe) Did you so testify before the Criminal Court of Appeals? A. Yes, sir."

Ordinarily, a party is not allowed to ask leading questions, nor cross-examine a witness which he places on a stand. However, where the witness is hostile and the

party placing him on the stand can make a showing that he is surprised at the testimony of the witness, the court within its discretion, may grant permission to cross-examine the witness.

In Carroll v. State, 55 Okla. Cr. 197, 28 P. 2d 588, 590, this Court stated:

"This court has held in substance that when a party has been deceived in placing a witness upon the stand, believing that the witness will testify to facts favorable to such party, and the witness upon the stand testifies to facts injurious to said party and conflicting with previous statements made by such witness, it would be a perversion of justice to deny such party the right to introduce in evidence statements made by such witness conflicting with the testimony given. This may be done upon the ground of surprise to explain the action of the party in placing the witness upon the stand and to destroy the injurious effects of such testimony. Sturgis v. State, 2 Okla. Cr. [362] 364, 102 P. 57; Paris v. U. S., 5 Okla. Cr. 601, 115 P. 373; Foreman v. State, 38 Okla. Cr. 50, 259 P. 176; Donahue v. State, 38 Okla. Cr. 87, 259 P. 179.

"Under the circumstances disclosed by this record and upon the statement of the county attorney that he was surprised at the testimony given by the witness at the trial, it was permissible and not an abuse of discretion upon the part of the trial court to permit the county attorney to impeach his own witness, and the introduction of the statement made by this witness before the justice of the peace was not prejudicially erroneous."

As to the next proposition concerning the cross-examination of the defendant concerning violations of municipal ordinances, the record discloses that defendant testified to having served sentences in the Granite Reformatory for burglary, in the U. S. Penitentiary at Leavenworth, Kansas, for violation of the Dyer Act, 18 U.S.C.A. §§ 2311-2313, and again for violation of the internal

revenue laws; that he had been convicted on two different occasions in Oklahoma county for the unlawful possession of whisky; and the portion of the evidence to which this objection is directed was the cross-examination of the defendant as to two police court convictions in Oklahoma City, for the illegal possession of whisky. We have had occasion to pass squarely upon this point.

In Wheatley v. State, 77 Okla. Cr. 122, 139 P. 2d 809, the syllabus of this case reads:

"1. County attorney may not inquire of defendant on cross-examination as to petty convictions in municipal court where the same do not constitute offenses under the state law.

"2. County attorney may inquire of defendant on cross-examination, for the purpose of affecting his credibility, as to his convictions in police court for violation of municipal ordinances prohibiting the possession or sale of intoxicating liquors as the same constitute offenses under the state law and are crimes within contemplation of statute. 12 O. S. 1941 § 381."

It is asserted that the trial court committed reversible error in recalling the jury to the courtroom after it had been deliberating for some time, and there inquiring of them how they stood numerically.

The record on this point is as follows:

"The Court:

"Let the record show that the jury is present in open court, the defendant present and the State is present by the Assistant County Attorney, and the question is asked, 'Have you arrived at a verdict?' and the answer is, 'We have not.'

"Now gentlemen, without stating how you stand, that is whether in favor of the plaintiff or the defendant, that is to say, for the State or the Defendant, can you tell

me how you stand numerically without indicating which way you preponderate.

"The Foreman: The final vote was 10 to 2.

"The Court: There is nothing I can do but ask you to resume your deliberation. Don't you think it is possible you may be able to arrive at a verdict?

"The Foreman: Personally, I do not.

"The Court: You understand that the fact that I asked you to go back is only because the law contemplates that you shall do your very level best to arrive at some verdict in the case, and I am compelled to ask you to go back for further deliberations."

Such conduct of the trial court did not amount to prejudicial error. Montgomery v. State, 19 Okla. Cr. 224, 199 P. 222.

The judgment and sentence of the district court of Oklahoma county is affirmed.

BRETT and POWELL, JJ., concur.