**Jackie Lee SCOTT, Plaintiff in Error,**

v.

**The STATE of Oklahoma, Defendant in Error.**

**No. A-12791.**

Court of Criminal Appeals of Oklahoma.

Jan. 20, 1960.

48

Burcham & Dunn, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, Presiding Judge.

Jackie Lee Scott was charged by information filed in the district court of Rogers County with the crime of rape in the first degree, was tried before a jury, convicted, and his punishment fixed at 15 years in the State Penitentiary. This was the minimum sentence for conviction of such a charge. The maximum provided is death.

The information charges:

" * * * that on or about the 24th day of December, A.D. 1957, in the county of Rogers, state of Oklahoma, one Jackie Lee Scott, then and there being, did then and there wilfully and unlawfully and feloniously commit the crime of rape in the first degree, in the manner and form as follows, to-wit: That the said defendant, in the county and state aforesaid, and on the day and year aforesaid, did, then and there, wilfully, knowingly, wrongfully, unlawfully, violently, forcibly and feloniously make an assault in and upon one Lucille V. Staton, a female person not the wife of him, the said defendant, and did, then and there, wilfully, wrongfully, forcibly, unlawfully and feloniously, by means of force and violence and threats of immediate and great bodily harm, accompanied by the apparent power of execution on the part of the said defendant, overcome the resistance of her, the said Lucille V. Staton and did rape, ravish and carnally know her, the said Lucille V. Staton, contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State."

Defendant challenges the sufficiency of the evidence to support the conviction.

The prosecuting witness, Lucille V. Staton, testified that she was a registered nurse living in Tulsa and employed at Saint John's Hospital there; that she was a widow, her husband having been dead for about five years; that she had at one time been public health nurse for Rogers County; that on December 24, 1957 she got together some Christmas packages to take to her parents and daughter who lived in Miami, Oklahoma, and left Tulsa about 10:20 in the morning. That she was driving her 1953 grey Nash four-door automobile and proceeding along U. S. Highway 66 towards Miami. She said that between Tulsa and Claremore a man driving a red pick-up truck drove up beside her on a four-lane road and motioned toward her rear tires, and that she pulled off on the side of the road and lowered the window glass and the man told her that it looked like the right rear wheel of her car was coming off, and that she told him she would not be surprised and that the car would probably fall to pieces; that he insisted and said, "No, seriously, it does look like it would fall off." Witness said that she then got out and went around, and that the man got underneath the car and looked at the wheel and checked it, and told her that he

was afraid that she would not make it in to Claremore, and said that he would follow her. She said she then got under the steering wheel, and the man got in her car on the right hand side and threw her luggage and Christmas packages in the back seat, and that he had a knife in his hand, and she asked him what was wrong with him. The man answered, "We are going down the road here and have a party, do you have any objections?" She said she just kept talking. She said as she drove along she tried to drive into a DX Service Station, operated by a Mr. Crowe, and that when she did the man put the knife against her neck and jerked the steering wheel of her car, and threatened to cut her to pieces and kill her if she did not obey him. She said she drove on past the service station about a block and was ordered to turn off on a gravelled side-road and drove down this road about a quarter of a mile, and was ordered to stop the car, which she did.

Witness said that after she stopped the car, she was ordered to remove her underclothes, and believing that the man would kill her if she did not, she obeyed. That she was caused to get into a half reclining position in the front seat of the automobile, and that then the man unfastened his trousers and placed his private parts in hers, and they had intercourse. She said she did not willingly have sexual intercourse, but complied believing that if she did not do so she would meet her death. She said they were stopped on the side road about ten or twelve minutes; that she then put on her underclothes and defendant fastened his pants, and she drove down the gravelled road where she could turn her car, and then drove her assailant back to his red pick-up truck and he got out of her car and she drove back towards Claremore. She stopped at a service station where she knew the operators, and telephoned the sheriff's office, and drove there immediately. She said that about ten or twelve minutes had elapsed since she had been raped. That after she reported the rape to the officers they drove her to the office of Dr. W. D. Anderson, Claremore, for a

vaginal examination, and thereafter the officers drove her back to the scene. Thereafter witness drove on to her parents' home in Miami.

Witness identified the defendant, who was sitting by his counsel in the court room, as her assailant.

Witness said that following the attack on her and on December 30, 1957 she came back to the sheriff's office in Claremore to view a line-up of six or seven prisoner suspects to see if she could identify her assailant and that she identified the defendant, Jackie Lee Scott.

On cross-examination Mrs. Staton was asked if many cars passed as she drove her assailant along Highway 66, and she answered: "I presume there were, I couldn't say definitely, because we only drove a short distance." She further said: "I was so scared it was all I could do to even drive."

As to the description of her assailant, counsel asked: "Now, Mrs. Staton, do you remember how he was dressed at that time? A. Very vaguely." She said: "I know he had on a red cap of some sort, and a leather jacket that was out at the elbows. If I am not mistaken he had on dark trousers." She admitted that at the preliminary examination she may have described the jacket as a brown leather jacket. She said she gave the description of her assailant to the officers when she reached Claremore a few minutes after the attack. She said her assailant had dark hair and dark eyes. She had estimated the height of her assailant as around 5′ 5″, and his weight at around 135 or 140 pounds. She said that she was 5′ 2″ in height. She said that prior to viewing the line-up of prisoners and identifying the defendant as her assailant, she had gone on the lot near the jail and pointed out a red pick-up truck as being a truck similar to the one driven by her assailant when he stopped her on Highway 66. She did not know the make of the red pick-up, but said it had a chest on the back.

Witness said that at the line-up at the county jail the prisoners were in shirt

sleeves and were bare headed; that no one had pointed out the defendant as her assailant, but she picked him out although he was not wearing the red cap or jacket he wore when he assaulted her. She admitted that defendant was taller and heavier than she had thought when she first described her assailant to the officers. She then estimated at time of trial his height at about 6 feet, and his weight about 160 to 165 pounds.

Bill Bryant testified that he was an agent or investigator for the Oklahoma State Bureau of Investigation; that at 11:20 a. m. of December 24, 1957 he was in the sheriff's office at Claremore with a Lieut. Abbott and Mrs. Lucille V. Staton came in and said that she wanted to make a complaint, and said that she had been raped; that they talked with Mrs. Staton a few minutes and then witness and deputy sheriff Art Haner took Mrs. Staton to the office of Dr. W. D. Anderson for an examination, and after that they drove her to the scene of the crime, five and a half miles south of Claremore, and three-quarters of a mile east of Highway 66 on a gravel road. He said that Mrs. Staton had reported that the crime took place about 15 or 20 minutes prior to her arrival at the sheriff's office; that she reported her assailant as having driven a red pick-up truck, as being a white man between 25 and 35 years of age and 5′ 5″ to 5′ 6″ tall and weighing about 135 pounds and that he wore a red leather cap and brown leather jacket with sleeves worn.

On cross-examination witness estimated the defendant present at trial to be about 6′ in height, and to weigh about 175 pounds. Witness did not participate in the apprehension and arrest of the defendant.

Ed Hixon testified that he was chief of police of Claremore and had been for about six years; that some time after prosecutrix charged that she had been raped, he displayed to her a number of pictures and she selected one of the defendant and said it looked like her assailant, but she could not be sure. That following this he and sheriff Amos Ward arrested defendant, and

the next day placed him in a line-up and Mrs. Staton identified defendant as her assailant. Witness identified a red leather cap, State's exhibit No. 2, as the cap defendant had on at the time of his arrest; and a pocket knife, State's Exhibit 1 as being in defendant's possession at the time of his arrest.

Amos Ward, Sheriff of Rogers County, testified that he was sheriff on December 24, 1957; that he received the report that Mrs. Staton made to his office; that she was later shown six or seven pictures and from such pictures identified one as the picture of her attacker; that it was a picture of Jackie Scott; that he and Chief of Police Hixon commenced looking for Jackie Lee Scott, and found that he had a red pick-up similar to the one described by Mrs. Staton as being driven by her attacker parked on the street. He said that when arrested Scott was wearing a red cap and a blue denim jacket. He identified the cap, State's exhibit 2, and the knife, State's exhibit 1. He said the arrest was made on December 30, and the following day they had a line-up of prisoners and Mrs. Staton picked defendant as her attacker.

On cross-examination witness admitted that defendant was taller and heavier than Mrs. Staton had described her attacker as being.

Dr. W. D. Anderson testified that prior to noon on December 24, 1957 the prosecuting witness, Mrs. Staton, came to his office and told him that she had been attacked and was afraid she might have been exposed to venereal disease. He said that he made a pelvic or vaginal examination and cleaned out the vagina and put some of the secretion on a slide and examined it and found live male sperm. Witness further stated that there was quite a bit of redness to the lower part of the vagina, the lips of the vagina, which indicated some trauma [injury] had occurred. It was his opinion that she had had recent intercourse.

This closed the State's evidence and it rested. Whereupon defense counsel inter-

posed a demurrer, which was overruled, and the court at the request of the State ordered the jury to be kept together and recessed for the night.

On re-convening the next morning and out of the presence of the jury, defense counsel advised the court that error was in the record by reason of the court not permitting counsel to ask Mrs. Staton if it was not a fact that a number of years before she had been convicted of being intoxicated in a public place. The court had ruled out the question when Mrs. Staton was testifying for the reason that, as he thought, such a conviction would have been for a misdemeanor, not involving moral turpitude.

The court went on to say, with reference to the incident, the following day:

"Well, of course, as I recall, you gentlemen came up to the bench, and we were conversing about it, and the court never passed on the thing, and all of a sudden you decided to withdraw it, and did withdraw it, and then the State rested, you have demurred to the evidence, and the court has overruled your demurrer, and that's the state of the record at this time.

"Now, then, I take it you are asking to reopen the State's case. Is that the idea, or just what is it?

"Mr. Hamilton [for defendant]: No.

"By the Court: In other words, we have already passed on demurrer, and of course, you demurred after the State rested, and the court has already passed on your demurrer, so it's your turn to put on evidence. I just wonder where we are.

"Mr. Hamilton: Our position is simply that the court was clearly of the opinion that it was not admissible, and we didn't have the books at hand, and withdrew the question pending the securing of the books to establish the fact, what we were claiming to be the law was.

"Mr. Kight [Special prosecutor]: Your Honor, the State feels that since they withdrew the question at the time it was originally asked, without a ruling of the court, and in view of the fact that they waited until after the State had rested, and demurrer of the defendant had been interposed and overruled, and in view of the fact that counsel has stated that what they seek to prove is a plea of guilty by the prosecuting witness to being intoxicated in a public place some five years ago, that it would be inadmissable, even if it had insisted on prior to the time the State rested, and that we object to being required to re-open our case at this time."

Going back to the record at the time Mrs. Staton was testifying, on cross-examination counsel for the defense had asked Mrs. Staton: "Well, have you ever been convicted of the commission of a crime?" And witness had answered: "What constitutes a crime?" Counsel had gotten into a hassel over this, and the court directed counsel to approach the bench and not make remarks so the jury could hear. Said the court:

"Then come around and talk into the record like you should do. Don't be making suggestions and talking so you will be heard by the jury—

"Mr. Hamilton: I didn't mean to do that.

"By the Court:—all the time. The court doesn't mean for you to either, so let's just proceed now.

"Mr. Hamilton: For the time being I will withdraw the question until I get a case down here and show it to you.

"By the Court: All right, you withdraw the question?

"Mr. Hamilton: Yes."

The record fails to show that counsel, prior to the time the State rested and the court overruled the demurrer to the State's evidence, ever asked the court to permit him to further cross-examine Mrs. Staton with reference to any previous conviction.

He did not then seek to re-open the case, but proceeded to put on his testimony.

Jackie Lee Scott's testimony is fairly summarized by defense counsel, as follows:

"That he was 25 years of age—24 years of age at the time of the commission of the alleged crime—that he had lived in Rogers County, Oklahoma, all of his life, with the exception of two years in the army in which he had been stationed in Japan and Korea; that he received an honorable discharge on September 12, 1952. That he had never been convicted of a crime, and that his folks and relatives had lived in Claremore, Oklahoma, all of their lives. That he was arrested on the 30th day of December, 1957, as charged in the information; that he had never made any effort to conceal himself. That he is married and lives with his wife out on a farm nine miles west of Claremore, Rogers County, Oklahoma; that on the morning of the 24th of December, 1957, he arose at 5:30 A.M., and he and his wife had breakfast, and that he then, at about 6:30 A.M., went to the home of Bud Kate, an employee of his, who lived about a mile away. That they had set some traps down in the river, and that he went down and ran the traps; that he then left the said Kate's house about 8:30 A.M. and went to his mother's home—about two miles west of Catoosa, Oklahoma. That he was at his mother's home until about 9:00 A.M., or a little after, and that he then drove to a point about five miles east of Tulsa, on Highway 66, where he was plumbing a house. That he had some fixtures ordered, and that they were to be delivered that morning. That after he arrived there, he was only there for about ten minutes, as the said fixtures had not been delivered, and when he left there to go home, he drove through Catoosa. That he crossed the railroad tracks on his way home—which home is nine miles west of Claremore—and that he saw Eddie Howell as he crossed the railroad tracks; and that he drove to a store called Keetonville Store at a point twelve miles west of Claremore; that he arrived there about 10:00 A.M. or 10:15, and was there about five or ten minutes, and he started on home and ran into Bud Kate and his uncle who were out of gasoline about a mile or a mile and one-half from the store. That he siphoned out about a gallon of gas and gave it to them around 11:00 A.M. of said morning, or maybe a little after, then he went home and helped his mother-in-law cover a cabinet with linoleum. That it took him approximately one hour to do this. That his wife came in about the time they were through. That he spent the evening at home. That he was in Claremore on the 30th day of December, 1957, where he was placed under arrest and charged with said crime. He further states that he had never owned a brown leather jacket with the elbows out; that at the time of his arrest he wore a pair of bluejeans, a charcoal grey or black jacket and the red cap that now is in evidence. That he wore the same on the 24th day of December as he had on at the time of his arrest. That he has tatooing across the back of his fingers, since 1950; that he is six feet two inches tall. That prior to the time that he was arrested, and on or about the 1st of December, 1957, he weighed 187 pounds. That he had never owned or worn a leather jacket of any kind; that he did own a blue denim-wool jacket. That he had never seen the complaining witness until she appeared at the preliminary hearing. That he did not perpetrate rape upon her, did not know of her previously, nor had he ever followed her automobile at any time. That he was acquainted with Sheriff Ward and with Ed Hixon."

Edward Howell testified for the defense and said that he lived in Catoosa (a village located on U. S. Highway 66 between Tulsa and Claremore) and was acquainted with

the defendant; that he remembered seeing him about the 24th of December, 1957. He said that he had been to his cousin's who lived west of the town of Catoosa and as he was driving toward Catoosa he passed the defendant about a block and a half from town. He said defendant was driving a red pickup truck and had on a red cap, and that the cap introduced into evidence by the State looked like the cap defendant was wearing. He said that it was about 10 A.M. when he saw defendant.

Roy Conley testified that he was a resident of Catoosa; that on Christmas Eve, December 24, 1957 he was in Claremore; that he saw the defendant driving in his pick-up near Keetonville store located on Highway 20; that this was about: "In the neighborhood of 10:30". Witness was driving a car and just waved at defendant, and noticed that defendant had on a red cap. Witness was driving from Claremore to his home in Catoosa.

Witness L. Ward testified that he lived in Sand Springs (on Highway 66 near Tulsa); that on Christmas Eve 1957 he had gone to near Collinsville to pick up pecans; that his nephew was with him; that he was driving an old pick-up truck; that he ran out of gas something like three-quarters of a mile south of Keetonville; that defendant came along and siphoned out some gas for him and he drove on into Collinsville about 12 to 15 miles distance. Witness did not have a watch, but said that it was around 10:30 or 10:45 when he got to Collinsville, because a TV program came on after he got there, and it was the 11:30 program that he liked to watch. He said defendant had on a red cap and a dark wooly jacket of some kind.

Mrs. Scott, mother of defendant, testified that her son had never owned a leather jacket.

Mrs. Claudine Miller, sister of the defendant, testified that she lived in Catoosa and that defendant had never owned a leather jacket in his life.

This closed the evidence for both the State and the defendant. No demurrer was interposed. The court instructed the jury and submitted the case with the results hereinbefore stated.

In the case of Gaines v. State, Okl.Cr., 267 P.2d 612, this Court, in line with many of its decisions, held that conviction for rape may be had on uncorroborated testimony of the prosecutrix, or on slight corroboration, where the testimony is not inherently improbable or unworthy of credence. And it was further held that in a prosecution for rape wherein the testimony of prosecutrix and the defendant conflict, and evidence disclosed no lack of probability, verdict of guilty will be sustained.

In common with Runyon v. State, Okl.Cr., 304 P.2d 353 and many other cases from this Court, it was further held that it is the exclusive province of the jury to weigh the evidence and determine facts, and where the verdict is based on probable testimony, reviewing court will not interfere with verdict though there is a sharp conflict in the evidence and different inferences may be drawn therefrom.

Here the evidence, which has been fully summarized, discloses without contradiction that Mrs. Staton had been assaulted. The testimony of Dr. W. D. Anderson corroborated her statement as to that. Her attacker drove a red pick-up truck, and different from most pick-ups it had a chest on the body, because defendant did plumbing work. The truck was pointed out by the prosecutrix. Her attacker wore a red leather cap, so she told officers immediately following the attack, something unusual to say the least, and defendant when eventually taken into custody was wearing such a cap. Witness thought her attacker was wearing a brown leather jacket with elbows worn, but it appears that he owned a dark wooly jacket, thus a discrepancy. She thought that her attacker weighed but 135 to 140 pounds, and was 5'5" to 5'6" tall, but he testified that he was 6'2" tall and weighed 187 pounds.

However, the jury had for consideration the fact that prosecutrix was a small woman, 5'2" tall and that when he accosted her he was pointing at her tires and ordinarily she could not be expected to observe him for weight and height, and if she had consciously attempted to do so accuracy could not ordinarily be expected. She said that he had dark eyes and hair. This was never disputed. The act charged took place in the front seat of the car and the attacker was on his knees on the floor of the vehicle, and had pressed a knife to the neck of prosecutrix and threatened to kill her. Under such circumstances her fright must have been intense.

It is notable that prosecutrix picked out a photograph of defendant from a half dozen exhibited to her, and a day or so following identified defendant in a line-up of prisoners, and at a time when he was in his shirt sleeves and without headgear. She was positive as to identification. There was no equivocation. Further, defendant offered no evidence to prove an alibi. In fact, all the evidence places him within minutes of the place of attack with every possibility that he could have been on Highway 66 at the time testified to by the prosecutrix.

Under the circumstances recounted the principles of law announced in Gaines v. State, supra, and many other cases from this Court, must be applied. We do not find any facts or circumstances that make the testimony inherently improbable or unworthy of credence. There is nothing in the evidence to justify this Court to interfere with the verdict of the jury.

██ There is a matter that has given the Court some concern. It was important to the defense to discredit the testimony of the prosecutrix, if that could be done. Defense counsel asked her if she had ever been guilty of a crime. Witness asked what constituted a crime. She was not advised. The special prosecutor contended that the conviction must be for an offense involving moral turpitude. The trial judge seemed to agree, so defense counsel withdrew the question and stated something to the effect that the question would be renewed when counsel would present the court cases from this Court holding that the question was a proper one. However, the record fails to show that this was done. When the State closed its case defendant interposed a demurrer, which was overruled and the court recessed for the night. The jury was kept together at the request of the State, and the following morning defense counsel advised the Court that there was error in the record by reason of the defendant not having answered his question propounded. The court called attention to the fact that counsel had withdrawn the question and inquired if his then purpose was to have the case reopened for the State. Counsel answered "No," and proceeded to put on his evidence. Although it is our opinion that by reason of the long line of cases from this Court [1] that the question was elemental (the charge of drunkenness in a public place being a misdemeanor, a violation of a State statute —37 O.S.1951 § 8), and that prosecutrix should have been required to answer, but probably the question propounded in a different form, to-wit: "State whether or not you have ever been convicted of being intoxicated in a public place." If she had denied it, then counsel could have further cross-examined witness when he would put on his evidence and could have shown such conviction from records or a court clerk, if there was such a record. He could also have refreshed the memory of witness by stating the court case number and date of the conviction, if such took place. Of course defense counsel could merely have been on a fishing expedition, caused by rumors. The purpose of such evidence would bear on the credibility to

---

1. James v. State, 1938, 64 Okl.Cr. 174, 78 P.2d 708; Wheatley v. State, 77 Okl.Cr. 122, 139 P.2d 809; Chambless v. State, 90 Okl.Cr. 423, 214 P.2d 947; Strickland v. State, 1930, 46 Okl.Cr. 190, 284 P. 651 and cases cited; LeBlac v. State, 95 Okl.Cr. 280, 245 P.2d 134.

be given to the testimony of witness by the jury. Counsel should have offered evidence, under the circumstances in this case, on the question, when he put on evidence for the defendant, and if the court persisted in his incorrect idea that a possible conviction must involve moral turpitude should have dictated into the record what his witness would testify to, if permitted. But, as the evidence that we have recited shows, the question was abandoned and waived. Any right personal to a defendant may be waived. As often said, a defendant in a criminal case may waive any right not inalienable given him either by the statute or the constitution, where it can be relinquished without affecting the rights of others. Martin v. State, 92 Okl.Cr. 182, 222 P.2d 534; Ex parte Faulkenberry, 95 Okl.Cr. 259, 244 P.2d 324; Hutchinson v. State, Okl.Cr., 278 P.2d 858; Sanders v. State, Okl.Cr., 287 P.2d 458.

█ Counsel next urges that there is error in that the jury was housed in some seven rooms in a hotel one night during trial. On motion for new trial there was evidence that there were a number of telephone calls which went out of the hotel from the rooms. Counsel insist that this was in violation of 22 O.S.1951 § 857, and in support thereof is cited the case of Landers v. State, Okl.Cr., 281 P.2d 193. An examination of the record, including the findings of the trial court at the time of the hearing of the motion for new trial, discloses that the proposition urged is without substantial merit.

In the within case, different from the Landers case, the trial had not ended and the case had not finally been submitted to the jury. The State had completed its evidence at the close of the day. The defense was willing that the jury be permitted to separate, but the special prosecutor, who seemed to have charge of the prosecution, objected. The court thereupon admonished the jurors that they must be kept together under the care of bailiffs. The men were in charge of Bailiff Dick, and the women in charge of another bailiff, Mrs. Dick. The court advised the jurors that they might telephone their homes that their families might know that they would not be home that night.

The general rule is that prior to final submission of a case it is a matter of discretion with the trial court as to the jurors being allowed to separate and the burden rests upon the defense to affirmatively show that prejudice resulted from the separation. There is no evidence or even contention that the telephone calls happened after the case was finally submitted. The court properly admonished the jury not to talk to anyone about the case, or discuss it among themselves until finally submitted. The case of Cox v. State, Okl.Cr., 283 P.2d 545, is in point and decisive of the issue here attempted to be raised. It discusses the principles involved in great detail, and we shall not lengthen this opinion by quotations. The case may be consulted.

The judgment is affirmed.

NIX and BRETT, JJ., concur.